JOHN WHELAN, appellant,
*against*
WILLIAM WHELAN and JOSEPH WHELAN, respondents.

*W.* a man, 74 years of age, owning a considerable real estate, the father of 7 children, and whose wife was sickly and irritable, was troubled for several years with dissensions among his children about the management of his property, his wife taking part with all his children on one side, except *Wm.* & *J.* two of his sons, who took part with him ; and the dissensions ran so high that the mother and the children who took part with her, departed, leaving *W.* and his two sons *Wm.* & *J.* in possession of the property, the management of which was confided by their father to them, as it had been for some time before the family was broken up. *W.* was credulous and easily led by *Wm.* and shortly after his wife left him, he was sued in a Justice's Court for her board; and on asking *Wm's* advice, *Wm.* told him, that if he intended giving him any thing he wished he would do it; that, as he and his mother were conducting, he would soon have nothing to give. *W's* fears being alarmed by a belief that his wife would dissipate his property, in order to place it beyond the reach of debts which she might contract, he was induced to convey most of his real and personal estate to these two sons, in fee, amounting to more than $9000, and a farm, &c. to *Wm.* in trust for another son ; but which trust was declared by parol only. Though he had before declared an intention to give all his estate to *Wm.* & *J.* by way of advancement ; and though they executed to him a bond and mortgage to secure his and his wife's maintenance, and $50 a year, &c. during their lives ; yet, *held*, that the conveyance, executed under such circumstances, was void, as being caused by fraud, undue influence, and unfounded alarm, excited or countenanced by *Wm.* ; and being also for an inadequate consideration ; and though *J.* might have had no part in bringing it about ; yet, *held*, that it was also void as to him.

To warrant relief, for any cause, in a court of equity, (e. g. undue influence in procuring a conveyance) it must be stated in the bill ; but the charge need not be direct ; it is sufficient if, on a hearing upon the

pleadings and proofs, the ground of relief can be gathered from an examination of the whole bill.

A conveyance obtained by children from a father will not be sanctioned by a court of equity, if it appear to have been caused by an abuse of confidence reposed by him in his children, who, for the purpose of procuring it, took advantage of his age, imbecility and partiality for them, the conveyance being also for an inadequate consideration.

A conveyance by a father 74 years of age, his wife being nearly 70 years of age, and in delicate health, to his two sons, of real and personal estate worth more than $9000, taking from his sons a bond and mortgage to secure his and his wife's maintenance, and an annuity of $50, during their lives; *held*, to be for a consideration grossly inadequate; it not appearing to be intended as an advancement.

If a representation be made by one to another who is going to deal in a matter of interest upon the faith of that representation, the former shall make it good.

He who bargains, in a matter of advantage, with a person, placing confidence in him, is bound to show that a reasonable use has been made of that confidence.

One falsely supposing his estate in danger, conveys it to his sons, who know that it is not in danger, but neglect to set the grantor right; this concealment is a sufficient ground for avoiding the conveyance.

Where a grant is made by an aged father to his children with whom he lives, who have the management of his property, and in whom he reposes particular confidence, if a court of equity sees that any arts or stratagems, or any undue means, or the least speck of imposition, or the least *scintilla* of fraud entered into the bargain, it will avoid the grant.

A deed procured by fraud or undue influence is void and will be set aside in equity, not only as against the one who practiced the fraud or exerted the influence, but as to third persons who have acquired interests under it, though they may be perfectly innocent; thus undoing the whole transaction.

Marriage is a valuable consideration; and a voluntary deed ceases to be so, if a marriage be induced by its provisions; but it should appear in evidence that it was the cause of the marriage. The mere fact, that one holding a voluntary conveyance of property marries, will not make the conveyance good.

Whether a marriage induced by a conveyance or settlement obtained by fraud or undue influence will make it good? *Quere.*

All persons concerned in the demand, or who may be affected by the relief prayed, ought to be parties to a bill in equity, if within the jurisdiction of the court; but to a bill filed against one to set aside a deed of bargain and sale of land absolute on its face, though the parties agreed by parol that it should be in trust for another, the latter need not be made a party; for the trust not being declared by writing, is void.

A trust must be manifested and proved by writing, or it is void within the statute of frauds.

APPEAL from the Court of Chancery. The appellant filed his bill in the Court of Chancery on the 29th of April, 1822, praying that a conveyance executed by him to the respondents, on the 19th of January, 1821, for his farm, situate at Johnstown, in Montgomery county, and a bill of sale of personal property thereon, and a conveyance of another farm in St. Lawrence county, and the personal property thereon, might be set aside. The bill alleged that the appellant was a native of Ireland, of the age of 75 years; that he had resided in Johnstown 35 years; that he had 7 children—Charles, of the county of St. Lawrence—John, Martha and Elizabeth, the last being the wife of W. Carr, who reside in the state of Indiana—Mary, who resides in Ireland, and Joseph and William, the respondents, resident at Johnstown. That his farm, at Johnstown, contained 350 acres, was of the value of $8000; upon which the appellant and his wife resided till the autumn of 1820. That some time previous to 1820, in consequence of advanced age and imbecility of body, he resigned the management of the principal part of his real and personal estate to his sons, John, Joseph and William, who resided upon and occupied his farm; that his son-in-law, W. Carr, leased the farm in 1819, and left it in the autumn of 1820. That for some time before the appellant was involved in a family quarrel or contention, which arose from unnatural jealousies and dissensions between his children, respecting the use and occupation of his estate; that his wife, Martha, aged about 68 years, in delicate health, and peevish in her disposition, took an active part in favour of some of the children, in opposition to the views and wishes of the appellant, which ultimately produced a dispersion of his family in the fall of 1820, by the removal of his daughter Martha, W. Carr and Elizabeth his wife, to the state of Indiana, his son John having previously removed there, his wife leaving home and taking lodgings with Mrs. Shurtliff, in the village of Johnstown—the appellant and the respondents thus being left in the sole possession of his farm. That the appellant owned a farm in St. Lawrence county, (N. Y.) on which his son Charles then resided. That he was called upon to pay the board of his wife

ALBANY,
April, 1824.

Whelan
v.
Whelan.

at Mrs. *Shurtliff's*, some months thereafter, which, by the advice of the respondents, he declined ; and, shortly after, Mrs. *Shurtliff* commenced an action against him in a Justice's Court. That he left the defence of the suit to his son *William*, whom he directed to ascertain the amount of the demand against him, who informed him. on his return from attending on the suit, that Mrs. *Shurtliff's* demand was $75, and that the appellant's wife had contracted a debt of about $100, at *Campbell's*, a merchant in the village of *Johnstown*. That *William* feigned to be very much cast down, upbraided him with not having advertised his mother pursuant to his previous advice, and said that if she was permitted to go on in that way, she would soon dissipate his whole estate, and unless the appellant should immediately do something to prevent it, the respondents would be forced to leave him. That the appellant was in great distress of mind, and sorely grieved at these representations of *William*, confirmed by *Joseph*, and asked what was to be done to prevent his wife *Martha* from dissipating his whole estate. *William* proposed that he should convey to him and *Joseph* his whole real and personal estate, which would put it out of the reach of his wife and the persons dealing with her, and that she would return home if people would no longer trust her ; that to secure his maintenance they would give him a mortgage of $5000 upon the farm, and a bond to pay him $50 a year, keep a good horse, and furnish him with all things necessary for his comfort and convenience, and indemnify him against the maintenance of his wife ; that he, confiding in the representations of the respondents, and desirous of saving his estate, agreed to the proposition. That he proposed to the respondents to go to *Johnstown* to draw the writings, to which they objected, alleging that the lawyers there were all combined against them in favour of their mother, and proposed to go to the office of Mr. *Reynolds*, at *Amsterdam*, in the same county, who was an entire stranger to them, all of which was falsely and fraudulently represented to him, as an excuse to decoy him out of the reach of his old friends and acquaintances, who probably would have advised him from an act so improper and inconsiderate. That

on the 19*th* of *January*, 1821, the appellant, *William* the respondent, and one *John Clary*, the particular friend of *William*, went to *Amsterdam*, about 12 miles from his residence, and called upon Mr. *Reynolds* to draw a deed of his farm to the respondents ; that before the deed was executed, *William* called him aside, and reminded him of his title to about 100 acres of land in *St. Lawrence* county, on which his son *Charles* had resided for 12 years, and insisted that this farm should also be conveyed to him, in trust for *Charles*—that as he trusted the respondents with all the rest, they could safely be trusted with that also. That he, confiding in their honesty and good intentions, consented to put in the deed the farm in *St. Lawrence* county, and also all his personal property in *Johnstown*, and in the use and possession of his son *Charles*, in consequence of the like persuasions and representations ; that the deed thus drawn was then and there executed and delivered ; that a mortgage was then drawn, on the farm in *Johnstown*, and a bond, in the penalty of $5000 from the respondents to the appellant, conditioned for the maintenance of the appellant and his wife during their lives, and to pay the appellant an annuity of $50. That the appellant did not execute the conveyances for the purpose of defrauding his creditors, or of hindering or defeating the collection of any existing demand, but, on the contrary, it was understood and expressly agreed, that the respondents should pay all debts due from him, which were few in number and small in amount ; that they had, however, paid little or no attention to his debts. That *William* took all the writings then executed, including the bond and mortgage, and that they were all put into a trunk in the house where the parties lived, and to which he (*Wm.*) had access at all times ; that the appellant had been deprived of the possession of the bond which accompanied the mortgage, and that he believed *William* had possessed himself of it, with all title deeds and other papers belonging to the appellant, and had either concealed or destroyed them, so that they were out of his possession or power to regain them ; that when the respondents were informed that the bond and other papers had been taken out of his possession,

they denied having any knowledge of them, and mocked him by offering to give new ones ; that they fraudulently detained the originals, and concealed them from him. That the personal property conveyed, and since in possession of the respondents, was worth $400. That at the time of the conveyances the respondents lived with the appellant, have since married, and still continued to live on the *Johnstown* farm, without permitting the appellant to exercise any acts of ownership. That after the conveyances, his wife returned home, remained there a short time, then went and lived with one *Wells*, afterwards with *John Clary*, and finally, in *March*, 1822, the respondents lodged her with one *John Taylor*, a poor man, occupying a log hut on the farm ; and that she was in a helpless condition, as well as the appellant, the respondents insisting on their living with them, or at such places as they designated. That he remained in the family of the respondents until about 3 weeks before he filed his bill, when he thought it most prudent and safe to depart ; and he took up his abode with *Henry Cuyler*, where he was at the filing of the bill, without the means of making him a compensation.

The bill then charged, 1. That the appellant was induced, by the persuasions and false representations of the respondents that their mother was spending the whole estate, to execute the deed for the purpose of preventing it, and upon no other motive: 2. That at the time he executed the deed, he did not intend to make any settlement or disposition of his estate whatever, more than to remove it out of the reach of his wife *Martha*, so that she might not, by her extravagance, spend or incumber it : 3. That there was no other moving cause to execute the deed, but the persuasion and representation of the respondents of the absolute necessity of so doing, to prevent the whole estate being dissipated by their mother ; and that the bond and mortgage were proposed to be given by the respondents merely to give colour to the transaction ; and that the terms of these were altogether dictated by them, and acceded to by him, he not believing that the plan was to make him wholly dependent on the respondents for a living: 4. That the respondents have

ALBANY,
April, 1824.

Whelan
v.
Whelan.

not complied with the condition of the bond : 5. That 3 or 4 years since, the respondents purchased a farm adjoining the appellant's, for the sum of $2000 ; that the complainant, to assist them in paying for it, loaned them, at different times, $300 and upwards ; and that, about a year ago, (in the spring of 1821) he borrowed of their brother-in-law, T. Goff, $170, for which he gave his note, which note the respondents pretend to have purchased, and to hold as a debt against the appellant, and that they refuse to pay him his annuity : 6. That on or about the 8th of June, 1820, and while his wife Martha was from home, the respondents moved and persuaded him to give one or both of them a conveyance of the Johnstown farm, for the purpose of preventing his wife from running him in debt, and encumbering his estate ; that in August or September following, William being dangerously ill, and his life despaired of, the respondents re-conveyed this to him, but yet pretend that they will avail themselves of the conveyance to them, and withhold the deed from the appellant.

The bill prayed for a re-conveyance to the appellant, &c. and for an injunction, and was sworn to by the appellant.

The respondents, on the 7th November, 1822, answered separately. Joseph admitted all the preliminary facts stated by the appellant ; but denied that he ever made any false representations to his father, to induce him to execute the deed to himself and William, in January, 1821 ; or that he knew the intention of his father, to execute such a deed, until it had been completed at the office of Mr. Reynolds.

William denied telling the appellant, that his wife had contracted a debt of $100, or any other sum, with Campbell, or that he ever called on Mrs. Shurtliff respecting her demand for board, until after the deed of January, 1821, was executed, or that he had informed the appellant that he had done so, or that her demand was $75, or that he had told the appellant that if his wife was permitted to go on in this way, she would, in a short time, involve him in debt, and dissipate his whole estate, or any thing to that effect ; otherwise than as hereinafter mentioned by him. He admitted that on the evening of his and his father's return from Albany, about the 18th January, 1821, they found a copy of a

summons against the appellant in favour of Mrs. *Shurtliff*; that the appellant then asked him what was to be done; that he then told his father, as he had often told him before, that if he had any thing to give him, he wished to know it; otherwise, he would abandon the farm; that, as the appellant and his wife were acting, they would soon have little enough for themselves. That the complainant answered, he had always intended the farm and the personal property for the respondents; and it was then agreed, that a deed should be executed to them for the real, and a bill of sale for the personal estate, which was accordingly done, and the bond and mortgage executed as mentioned in the bill. He detailed what passed at the office of Mr. *Reynolds* in his presence and that of *John Clary*; that as near as he could recollect, the appellant stated to Mr. *Reynolds*, that he owned a farm in *Johnstown*; that his wife refused to live with him; that he was apprehensive she would run him in debt; that the merchants would trust her, and he should have to pay her debts; that he had understood he should be charged $5 a week for her support, and, at that rate, he could not support her, and he was determined to provide for her maintenance on the farm, and get rid of all his estate, so that he could be kept in goal but for a limited period; that he intended his farm and the personal estate upon it, for the respondents, and he might as well give it to them to-day as to-morrow; and then stated what his sons were to give, and secure to him for the farm, and the personal property. That he, at the same time, conveyed the farm in *St. Lawrence* county, on which the appellant's son *Charles* lived, to *William*, who promised that he would do with it, and convey it to *Charles*, as the appellant should direct; and that he has always been, and still is ready to do so.

Both of the respondents admitted, that on the 20*th January*, 1821, they received from the appellant, a bill of sale of the personal property on both the farms; the personal property on the farm in *Johnstown* to belong to the respondents; and that in *St. Lawrence* to be held for *Charles*, or to be disposed of for the benefit of him as the appellant might di-

rect ; that the personal property of which they possessed themselves does not exceed $245 in value ; and that they have never possessed themselves of that in *St. Lawrence* county.

*William* admitted that they were to pay all his father's debts, except the debt due *Goff*, which he and *Joseph* were bound to pay ; and that they have complied with this part of the agreement. He denied that he took away the bond and mortgage executed to the appellant, or that they were, to his knowledge, placed in an unlocked trunk in the house, as charged in the bill.

*Joseph* further answered, that when he executed the bond and mortgage, he believed the conveyance to *William* and himself to be an absolute deed, subject only to the claims secured by the bond and mortgage. And he denied that the bond and mortgage were intended as a mere cover to the transaction, or that they were proposed by *William ;* but that, on the contrary, the transaction was fair, &c.

Both answered, that immediately after the deed was executed, they took absolute possession of the farm ; and that the appellant, for about 10 months afterwards, was satisfied with the transaction. That they respectively married in *May,* 1821, and *February,* 1822, and lived together on the farm. That in 1821, their mother came to reside with them, and continued with them about 4 months ; that she then lodged with *Wells,* of *Amsterdam,* till the winter of 1821-2. She then removed to *John Clary's,* where she continued till *April* or *May,* 1822, and then removed to *O. Taylor's,* where she continued till the bill was filed, when she came to reside with the respondents. That they never refused to pay *Wells* for her board. They admitted the conveyance in *June,* 1820, by the appellant, to them, of the farm at *Johnstown ;* that a mortgage thereon was executed, for $3000, by *William,* to the appellant ; and that, on the request of the latter, they re-conveyed to him in *September* following, *William* being then dangerously ill. That they know of no consideration or cause for this conveyance to them, unless it was in consequence of an expected prosecution from one *Lobdell,* and to defeat his recovery.

*William* further answered, that in *February* or *March*, 1822, he was charged with being in possession of the bond and other papers. He denied that he ever had them after their execution, or that he knew where they were, until a few days before the filing of the bill. He supposed the bond had been sent with the mortgage to be recorded, or that *Alexander M'Call* had it; but he had since been informed that the bond was with his papers, at *Hugh M'Call's*; and that it was, with other papers, delivered to him in *June*, 1821, although he had no recollection of it.

Both admitted, that on the purchase of the farm adjoining their father's, for $2000, he gave them $500 towards the purchase money; that this was in 1817; that he at the same time borrowed $170 of *Goff*, which they are bound to pay.

Both insisted, 1. That they purchased the farm for a good and valuable consideration, being the bond and mortgage executed by them; that the conveyance was not procured by representations that their mother was spending the whole estate, or any other false representations or persuasions; but that the appellant, of his own free will and accord, conveyed to the respondents, by way of settlement and advancement. 2. That it was in pursuance of a previous contract, well understood and agreed upon, that the conveyance was made; and that the persuasions and representations of the respondents, of the necessity of the conveyance to prevent their mother from dissipating the estate, were not the only moving cause for making the conveyance and bill of sale.

*Joseph* admitted that he had held himself out as a *bona fide* purchaser for a good and valuable consideration secured to the appellant; and that the principal consideration for making the conveyance and bill of sale, was the natural love and affection which he had for the respondents. That, previous to the conveyance, he had made no contract or agreement with the appellant, respecting the purchase of the farm; and that the appellant executed the deed on a contract well understood between him and *William*.

Both admitted, that the manner of using and occupying the appellant's real and personal estate had been a source of contention in his family for a number of years; and it was

difficult for any of his children to have his good opinion for any great length of time. That he frequently changed his opinion and wishes respecting them ; and as often wished to give one or the other a greater share in the management and use of his estate. That their mother had sometimes appeared to favour those children the most whom the appellant, at the time, was most inclined to oppose ; so that it was difficult for any one of the children to enjoy the good opinion of the appellant and his wife at the same time. And that the dissensions in the family had induced some of the children to remove, at the times mentioned in the appellant's bill.

The cause having been put at issue in the Court of Chancery, by a general replication to both answers, witnesses were examined on both sides.

*Testimony for the appellant, (taken in* 1823.)

*Daniel Wells,* had been acquainted with the appellant for 15 years, and believed him to be credulous and easily persuaded, by those whom he believed to be his friends. Witness had heard and believed that the appellant's wife had been badly treated, and suffered to wander abroad. She lived at witness' house about nine weeks ; and *Joseph Whelan* refused to pay for her board.

*Marcus T. Reynolds,* had known the appellant and *William Whelan* for about 2 years. On the 19*th* of *January,* 1821, they came together, with *John Clary,* to witness' office, and either the appellant or *William* requested him to draw the deeds, but which he did not remember. He did not recollect distinctly all the conversation that passed. The appellant stated he had been prosecuted for the maintenance of his wife, and that a recovery had been had against him, and that he was fearful he would be harrassed with law suits from time to time, for his wife's board and maintenance. But the witness did not know that the law suit was the cause of the conveyances ; though he believed the reasons assigned by the appellant were among the inducements to the conveyances. That he drew the deed of the farm in question, and subscribed his name as a witness ; and after its execution, some conversation took place between the appellant and *William,* relative to the *St. Lawrence* farm. Conveying

it to *Charles Whelan*, who lived upon it, was talked of, or to his children ; but it was finally conveyed to *William*, in trust for *Charles* and the children, to be conveyed to such of them as the appellant should direct. That the appellant appeared not to be prepared or anxious to exact a stipulation from them for the support of himself and wife, until (after the conveyance executed) the propriety of this had been suggested to him; and then the parties agreed upon the terms of the bond and mortgage mentioned in the pleadings, which the witness drew.

*Rebecca Cuyler*, had been acquainted with the parties for 14 years, during which time they had been in easy circumstances. The appellant and his wife lived at variance for several years, in consequence of strife and jealousy between the appellant and his children, about the use and management of his real and personal estate. The appellant's wife left her family, and went to reside with Mrs. *Shurtliff*, in the fall of 1820.

*Jacob A. Cuyler*, had been acquainted with the parties for 15 years, and they were in easy circumstances. He knew the manner in which the family had lived. The appellant and his wife had lived at variance, arising from strifes and jealousies between the appellant and his children, about the use and management of the real and personal estate. He had found the appellant easily led by *William*. In the family strife the appellant and the respondents were usually on one side, and the appellant's wife and the other children opposed to them. In his opinion, the appellant's real estate in *Johnstown* was worth $9,000, and would have rented for $250.

*Margaret Taylor* had been acquainted with the parties for 13 years ; and did not believe the appellant could have been easily persuaded by any person but his son *William*. For the last 2 years, the appellant's wife had been treated with coldness and neglect, and suffered to wander abroad and seek her living among strangers. Heard *William* say he would not pay any thing for her maintenance while abroad ; and heard her request *William* to furnish her with diet more suitable to her state of health, who said he would do so when he should go to *Albany*.

*Henry Cuyler*, had been acquainted with the appellant and his family for 30 years. He concurred with the other witnesses as to contention in the family and its cause, and as to their circumstances in life. He had found the appellant easily led by *William*, who with *Joseph* were the appellant's friends and advisers in 1819-20, when there was great strife and litigation in the family. He concurred as to appellant's wife wandering abroad, and the respondents refusing to pay for her board, because they had means provided for her to live at home. He considered the real estate worth $8000, and the personal about $170. He heard the appellant say he had conveyed the farm to the respondents to prevent unlawful claims against him by means of his wife.

*D. P. M'Naughton*, had known the family for 25 years; and concurred as to their strifes, &c. and their circumstances as to property; that the appellant was easily led by his son *William*; and as to the respondents' siding with the appellant in family disputes. He was present when the bill of sale and the bond and mortgage were executed. The appellant said it was a hard case for him to make an assignment of his property; for it was done for the express purpose of preventing *Martha* his wife from spending his estate. The appellant directed *William* to take the papers to the Clerk's office, have them recorded, and return them. He heard *William* request his mother, who lived at *Henry Cuyler's*, to go home, otherwise, he told her, he would not provide for her; but said if she would go home she should have a room and be treated as a mother. She declined going home. This witness agreed with *J. A. Cuyler* as to the value of the real estate.

*Alexander M'Call*, aged 21 years, had known the parties from his infancy, and they had been good livers. He concurred with the other witnesses as to the strife in the family, and its cause. The appellant was a credulous man, and easily persuaded by those whom he believed to be his friends. Witness' father, *Hugh M'Call*, had in his possession the deed, bond and bill of sale. He testified that the real estate was worth $8000, the personal about $200; and the yearly rent of the real would have been about $250.

*Hugh M'Call* had known the parties and the family 24 years, and concurred as to the value of their property, their strife and its cause. He stated that the appellant's wife board-ed at Mrs. *Shurtliff's* ; and *William* said that the price of her board was $5 per week. That *William* left with the witness the deeds and bill of sale with the bond ; and which were afterwards taken away by *William*, as the witness was inform-ed by one of his children and believed. He heard the appel-lant demand the bond of *William*, who told him to ask *Alex-ander M'Call* for it. Witness then asked *William* whether he had not the bond, whereupon he left the witness and the appellant, without giving any answer.

*Nancy M'Intyre*, had been acquainted with the appellant and his family for 30 years, lived near them, and they had always been good livers. The appellant's wife had been ill treated by the family for a number of years.

*Charles Whelan*, a son of the appellant, of *Louisville*, in *St. Lawrence* county, concurred as to the strifes of the fam-ily and the cause. The appellant was a man credulous and easily persuaded to any thing by those he supposed his friends ; and he might be persuaded to do any act dicta-ted to him when any fear of difficulty might threaten him or his property. He heard *William* say that the appellant had, by his advice, put his property out of his hands to prevent the creditors of *Martha* his wife from getting any thing from him for her board and maintenance abroad. That on the 24*th February*, 1823, the witness advised *William* to settle this controversy, and remove on to his own farm, giv-ing up possession to the appellant. But *William* said that he would not ; that he had now got the old man into the situa-tion he wanted him ; that he had worked to get him into that situation for 10 years ; and that he would not give up an acre, unless the appellant would come to his terms.

*Testimony for the respondents, (taken in 1823.)*

*John Clary*, aged 38 years, had been acquainted with the family from his nativity. He heard the appellant say at Mr. *Reynold's* office, on the 19*th January*, 1821, and afterwards at the appellant's house, and a number of times subsequent,

that he intended to convey his property in *Johnstown* to his sons *Joseph* and *William.* He had also said the same thing at the house of the witness. He was present at the appellant's house when the bond and mortgage were executed, and, with *Duncan P. M'Naughton,* subscribed his name as a witness to them ; at which time he heard the appellant say he had conveyed his farm in *Johnstown* to the respondents. He went in company with the appellant and *William* to the office of Mr. *Reynolds,* at the request of both parties, on the 19*th January,* 1821. There he heard the appellant, *William* being present, say to Mr. *Reynolds,* that he came to convey his farm in *Johnstown* to *Joseph* and *William ;* that he did so for the purpose of saving it from the creditors of his wife ; that he had been sued for her board the day previous by Mrs. *Shurtliff ;* that the reason he came to *Reynolds'* was because he could not trust the people of *Johnstown ;* and that he had been informed that if if he was not a freeholder they could not confine him more than 30 days on the limits for debt. The deed in question was then drawn, and executed, and was witnessed by the deponent and Mr. *Reynolds.* After the execution of this deed, the appellant stated that the people in *Johnstown* would still know that he was a freeholder in the county of *St. Lawrence ;* and therefore it would be necessary for him to convey his farm there to some person, as it would not be safe to convey it to his son *Charles,* he being in debt. That he would convey it to *William* in trust for *Charles* and his children, and by *William* to be conveyed as *Charles* should direct. He did not hear *William* say any thing to induce the appellant to make the deed to him ; nor did the witness say any thing to induce him to make the conveyance. He had heard the appellant say, " I protest to God, a child belonging to me shall not have one cent's worth of my estate, but my sons *Joseph* and *William ;* for the others robbed me of all I had ; they have not left me a chair to sit on." He concurred with the other witnesses as to the strife in the family and its cause. The contentions in the family had taken place within the last 4 years. The appellant's wife resided with the witness, in *March* and *April,* 1821; about 5 weeks, there being no contract as to the price of her board. *Joseph* and *William* were to pay the witness, and had

Whelan
v.
Whelan.

paid a part. He had heard the respondents say they could as well support her at home, and find her all that would be necessary for her comfort ; and *William* stated that he could not maintain her abroad. She had been weakly and out of health for several years ; and peevish and irritable in her feelings.   Previous to going to Mr. *Reynolds*, the family had always had their business done at *Johnstown* village. The appellant was a perfect stranger to Mr. *Reynolds;* but *William* appeared to be acquainted with him. The distance from the appellant's to Mr. *Reynolds'* was about 10 miles ; and to *Johnstown* village about 4 miles. Witness was present when the bill of sale was executed ; the reasons assigned for which were the same as those for conveying the real estate. The strife in the family had the effect to drive some of them abroad.

*Mary Kane*, heard the appellant, in 1820, and at several times after, say that he meant to convey his farm and property to *Joseph* and *William ;* and in *April* or *May*, 1821, he said he had given them a great bargain, for he had let them have the farm for a mere trifle, in comparison with what he ought to have had for it, or was offered for it before.   That he now only got the support of himself and wife and $50 a year ; and *Joseph* might now see (contrary to what his mother had wished to make him believe) that the appellant had not sent for him to make a negro of him ; for he had done well by him.   That in *October*, 1821; the appellant said he was satisfied with what he had done in regard to conveying his property to the respondents.

*Thomas Goff*, saw the appellant at *Albany* in the fall of 1820, and he said he intended to convey all his property in *Johnstown* to *Joseph* and *William*.   That his son *John* and his son-in-law *William* had taken away almost all his property, and left him considerably in debt ; and he would give the remainder to the respondents, who remained with him to take care of him ; that this was in consideration of their good conduct, and he would reserve enough to live on. He applied to the witness for a loan of $1000, and offered to give him good security, which he supposed was his farm. He is a brother-in-law of the respondents, who married his sisters.

*Catharine Goff*, heard the appellant say, in the winter of 1821, that he conveyed, or would convey his property to the respondents ; and he found fault with his son *John*, and son-in-law; *William Carr ;* stated that they had robbed him, and left him nothing but the house and land ;. and should not have a cent's worth more of him.

*Mary Hannesey*, sister to the respondents' wives, lived in the respondents' families in the summer of 1821, and till the month of *August*, 1822; heard the appellant say that *Joseph Whelan's* wife used the old lady better than her own daughter ever did ; that the old woman wanted a considerable attention to make her comfortable ; that he had convey-his estate to the respondents, and was perfectly satisfied ; that he expected no more than $50 a year : that in *March*, 1822, he demanded his rent of the respondents, who replied they would pay him his rent, if he would deliver up to them a certain bond. He said he would close the bond upon them. They replied, the bond was good for nothing. On the same day he said to the witness, it was astonishing the boys would not give him his rent ; but he was glad he had not received it; for then he could not get back his land. The appellant's wife, from bodily infirmities, made herself very unhappy in the family ; often complained of ill treatment and bad usage without a cause ; had heard the respondents try to coax their mother to live at home.

The consideration stated in the deed of the *Johnstown* farm was $5000.

Upon the above pleadings and proofs, the Chancellor dismissed the appellant's bill ; for which he assigned the following reasons :

THE CHANCELLOR. The complainant seeks to annul his own conveyances to two of his sons. These conveyances are valid, unless they were obtained by fraud ; the answers of the defendants deny all fraud ; and after a careful consideration of all the proofs taken in the cause, I am of opinion, that no fraud is proved.

The testimony most favorable to the complainant, is that of Charles Whelan, who states, that on the twenty-fourth

day of February 1823, the defendant, William Whelan, declared in substance, that he had worked ten years to get his father into his present situation, and that he would not give up the farm.

This testimony does not show, that fraud was practised in obtaining these conveyances. But this witness, who is another son of the complainant, can not be impartial, since, if his father should prevail in this suit, he may well expect to receive some portion of the property : and he himself says, that he has no reason to expect any thing more, in that event, than a son may expect from a father, or a child's portion.

Upon the whole case, it does not appear, that these conveyances were obtained by fraud ; and the suit must therefore, be dismissed.

The complainant in making these conveyances of all his property, has been very improvident, but he had power to dispose of his property, and he is not at liberty to revoke his own conveyances from mere repentance. I have no power to vary or dispense with the principle, that such a conveyance is valid against the grantor, when it is free from fraud. But the question of costs, is in the discretion of the court. And as the complainant is now poor, and unable to pay costs, and has become so by his imprudent generosity to his two sons, the defendants ; it will I think, be a reasonable exercise of discretion, to dismiss the suit without costs, against the complainant.

After entering the appeal in this cause, and before the argument on the merits,

Mr. *H. Cunningham*, the solicitor and counsel for the appellant in the Court below, and who argued the cause there, moved this Court for a rule allowing the appellant to prosecute here in *forma pauperis*, which was opposed by

Mr. *D. Cady ;* but granted.

Owing to Mr. *Cunningham's* engagements as a member of the House of Assembly, then in session, he did not argue upon the merits.

*H. Bleecker*, for the appellant. These conveyances were executed under such circumstances that a Court of Chancery ought to set them aside. The weakness and incapacity of the appellant, and the influence of the respondents over him, will be found abundantly established by the evidence. They were always on his side in the quarrels which disturbed this old man of 75—they were his sons, his agents in the management of the property, in whom he implicitly confided. He was easily led, and exhibits great mental weakness in the silly notions which he formed as to the amount which might be recovered of him for his wife's board, and the probability that it might ruin a man of his estate. He was prejudiced against all his family except the respondents, who, it is plainly inferrible, seized on a favourable moment, and induced him to disinherit all his other children. The evidence of any intention to convey to these sons, before the fatal summons was served on him at the suit of Mrs. *Shurtliff*, is extremely slight, and wholly disproved by the entire evidence. It was that trifling circumstance which worked him into a state of alarm, and enabled the respondents to profit by his fears ; and it is plain that these formed the whole or the principal ground of the conveyance.

Whether there is fraud actually proved or not, the consideration was so grossly inadequate, as to warrant an inference of fraud, (*Guynne* v. *Heaton*, 1 *Br. Ch. Rep.* 8, 9) independent of delusion or mistake. Here is much besides inadequacy. All was conducted by the advice of *William*, even to the conveyance of the farm in *St. Lawrence ;* and the conduct of the sons, afterwards, places their original motives in a very questionable point of light. Even the bond securing their father's maintenance and small annuity is withheld.

For the effect of fraud upon a conveyance, I refer to *Underhill* v. *Harwood*, (10 *Ves.* 209) *Boyd* v. *Dunlap*, (1 *John. Ch. Rep.* 482) and *Wendell* v. *Van Rensselaer*, (*id.* 350.) In the latter case the Chancellor refused to set aside the deeds, but from his reasoning, and the cases cited, it is evident he would have interfered and set them aside, had a case strong as the present been made out. *Huguenin* v. *Basely*,

ALBANY,
April, 1824.

Whelan
v.
Whelan.

(14 *Ves.* 273) was a voluntary settlement by a widow, upon a clergyman and his family, compassed by his undue influence over her, having first got the management of her affairs. This was set aside, on the same grounds of policy as are applicable to the relation of guardian and ward. One who is the actual guardian of another, or one who is placed in a relation holding the same degree of influence, should come within the same salutary rule.  The Court decided the case last cited upon the principles and authorities advanced by Sir *Samuel Romilly*, and the other counsel concerned for the complainant, to which I refer as a lucid exposition of the doctrine on this head.   *Hatch* v. *Hatch.* (9 *Ves.* 292) and *Chesterfield* v. *Janssen*, (2 *Ves. Sen.* 155) both contain principles applicable here ; and in *Griffin* v. *De Veulle & others*, (3 *Wood. Lect. App.* 16) a deed was set aside. under circumstances less strong than those presented by the present case.

In determining whether there be fraud, the Court will look to all the circumstances of the case, the weakness of the appellant, and the relation of the parties. (1 *Mad. Ch.* 224.) Proof of actual fraud is not necessary, but may be inferred from such relation, or other circumstances. (*Evans* v. *Llewellin*, 1 *Cox*, 333, 339.   *Wright* v. *Proud*, 13 *Ves.* 136, 137.)   Misrepresentation, age, inexperience, parental influence, confidence, a confiding temper, improvidence, distress and negligence, in the vendor, are grounds for setting aside a sale. (*Wyatt* v. *Grove*, 2 *Sch. & Lef.* 492.   *Murray* v. *Palmer*, id. 474.   *Carpenter* v. *Herriot*, 1 *Eden*, 338, *Bowes* v. *Heaps*, 3 *Ves. & Bea.* 119.   *Wharton* v. *May*, 5 *Ves.* 27, 67.   *Griffiths* v. *Robbins*, 3 *Mad. Ch. Rep.* 191. *Gibson* v. *Jeyes*, 6 *Ves.* 267, 278.)

*A. Spencer*, (same side,) would give the gentlemen, who were to answer, notice, that he should, in reply, rely on the following authorities : To show that if void as to *William*, the deeds were so as to *Joseph*, though the latter might not be implicated in the fraud, *Huguenin* v. *Basely*, (14 *Ves.* 273, 288 ;) to shew the effect of the *suppressio veri*, undue advantage and inadequacy of price, 1 *Mad. Ch.* 208 ; *Jervois* v. *Duke*, (1 *Vern.* 19) *Broderick* v. *Broderick*, (1 *P. Wms.* 239) *James*

v. *Graves.* (2 *id.* 270) *Bowles* v. *Stewart,* (1 *Sch.* & *Lef.* 209) 1 *Mad. Ch.* 211 ; 1 *Fonbl.* 113 ; *Newland on Cont.* 365-6 ; that the conveyances should be set aside, notwithstanding the grantor's object was to screen his estate from the payment of his debts, *Young* v. *Peachy.* (2 *Atk.* 258 ;) that the vendor's acquiescence is no objection, *Murray* v. *Palmer,* (2 *Sch.* & *Lef.* 486) *Crowe* v. *Ballard,* (1 *Ves. Jun.* 215) *Foche* v. *O'Brien.* (1 *Ball* & *Beatty.* 330 ;) that the respondents cannot avail themselves of the statute of frauds, as to the use in favour of *Charles* in the *St. Lawrence* farm, though this was not declared in writing, 1 *Mad. Ch.* 305 ; and that the marriage of the respondents will not vary the case, if the conveyances were originally invalid for fraud, *Sterry* v. *Arden,* (1 *John. Ch. Rep.* 271.)

*D. Cady* & *B. F. Butler,* for the respondents. We shall insist, that the decree of the Chancellor should be affirmed, for the following, among other reasons :

1. Because there is nothing in the pleadings or proofs which shows that the respondents, or either of them, possessed or exerted any such influence over the appellant, as should avoid his deed to them.

2. Because, if any such influence existed, the appellant has not, by his bill, made that the ground upon which he asks relief ; but he rests his claim for relief, upon the ground that the respondents had practised a fraud upon him, by making false representations respecting debts contracted by his wife, and thus obtained a conveyance from him of his estate in *Johnstown.* That charge being positively denied by the respondents, and not supported by the proof, the complainant can be entitled to no relief.

3. Because, as it appears from the pleadings and proofs, that the respondents were unmarried at the time the appellant conveyed the estate in *Johnstown* to them, and that they both, soon after they took possession of the estate, were married to women, to whom, or to whose friends and connexions the appellant had declared the respondents were the owners of the estate, it would be " *against public policy, and contrary to equity and good conscience,*" to permit him now to avoid that conveyance.

4. Because the deed for the farm in the county of *St. Law-rence*, was given to the respondent, *William Whelan;* and it appears from the proofs, that it was given in trust for *Charles Whelan* and his children, and to be conveyed to such person as *Charles Whelan* should direct: *Charles Whelan*, therefore, is a neccessary party to any question respecting the validity of that deed ; and without his being a party no decree for a re-conveyance can legally be made.

There is much irrelevant matter in the bill. Many of the charges relate to a time long after the deed was executed ; and their admission by the answers, or establishment in proof could have no possible influence. (*Morris* v. *Burroughs*, 1 *Atk*. 404.) What has the ill usage of the mother, for instance, to do with the case ? But these charges are denied by the answers ; and there is a failure to establish them in proof. There is very little testimony to any of them, and that is slight, general, imperfect, and can weigh nothing against the positive denial in the answers.

Many cases have been cited as to undue influence, and this transaction has been placed in a variety of shapes. Sometimes it has been likened to a deed from a ward to his guardian ; sometimes like one from a *cestui que trust* to a trustee, or a client to his attorney ; and sometimes the case has been precisely inverted, by making it like a deed from a child to a parent—not from a parent to his children. But there is obviously no sort of analogy in any of the cases relied upon. They are those where influence or overreaching may be presumed, and, upon principles of policy, is presumed by the law. (*Morse* v. *Royal*, 12 *Ves*. 371.) If a case could be found of undue influence exercised by a child, over a father, or presumed without proof, it would, we admit, go to make out the appellant's case ; but we believe both the cases and the rational presumption are rather the other way, and in favour of the father's influence over the child and this, we presume, is the first time that the contrary was ever pretended. (*Vid. Middleton* v. *Kenyon*, 2 *Ves. Jun*. 391, 413.)

In simple truth, the deed was an advancement to these children, long in contemplation, and deliberately executed ;

a species of conveyance highly favoured in the law, and good even without any other consideration. A deed to a stranger, without pecuniary consideration, enures to the use of the grantor, but it is otherwise where the consideration of blood intervenes. There the use passes to the grantee, without any other consideration.

*Huguenin* v. *Basely*, (14 *Ves.* 273) is so much relied upon for the appellant, that we are referred not only to the case but the argument. What is the case? One of mere imposition, influence and fraud, exerted over a female, who was a stranger to the value of the estate which she granted, and who resided thousands of miles from it. The letter, incorporated in the report, was considered as decisive evidence of undue influence. Reliance was placed by counsel, upon the defendant's being the spiritual guide of the plaintiff, on the authority of *Pothier* ; and this author, with the concurrent authority of Lord *Hardwicke*, is cited against the exercise of bounty to an *administrateur*, or one managing the affairs of another. To apply the argument and principles of that case, the facts should have some analogy to the present; but none can be shown. Here the appellant had resided on his farm for 35 years, was perfectly acquainted with its value, and had tried the temper and capacity of the respondents, his children, to whom he makes the advance. *Griffiths* v. *Robins*, (3 *Mad. Rep.* 191) was the case of a female donor, 84 years of age, nearly blind, dependent upon and placing a confidence in the donee, granting her estate, and reserving a very inadequate annuity. That is not this case. The appellant was capable of managing his own affairs. He secures to himself and wife a comfortable living, beside $50 annuity, and the payment of all his debts, out of a farm which would rent for only $250, a sum, in itself, utterly inadequate to the purposes of their maintenance. *Lewis* v. *Pead*, (1 *Ves. Jun.* 19) is much more analagous. Mrs. *Lewis*, when 75 years of age, leased for 99 years to *Jones*, a stranger, for £70, a very inadequate rent, the premises being worth £130 ; and *Jones* boasted that he had made a bargain worth £300. On a bill filed by her son to set aside the lease, per *Buller*, J. "There must be some substantial

ground for supposing fraud stated and proved. Her being old is no proof that she was imposed upon. She did not choose to acquaint even her own attorney with her reasons for granting this lease. There is no sort of fraud in the original concoction of the business. We have seen the greatest abilities displayed at a greater age than 75 ; therefore, that alone can be no ground to presume imposition. She had a right to make this contract ; and though the reasons of her favour to this man do not appear, that does not signify ; and it appears she lived on bad terms with her son the plaintiff."

We do not deny that there may be such influence of the son over the father as to avoid a deed ; but what is the proof of influence in this case, if it is to be deemed in issue, which we deny ? None of the witnesses state any particular facts or instances, from which influence is to be inferred. All is mere general opinion. Even in a case of confirmed lunacy, a host of opinion will not prove it, but the facts and grounds of inference must be stated. (*Coop. Med. Jur.* 289.) Is it enough that these children sided with their father in the family controversies ? He was morally and legally the head of the family, and it was the duty of all the children to side with him. These did so under all circumstances ; and is this to be imputed to them as a crime ? If they were scoundrels for siding with him, he was the greater one, and has no right to allege this against his children. Every presumption is in favour of a deed from a father to his son, till positive fraud be shewn. (1 *B. & P.* 120.) An attorney, while carrying on a law suit, is not allowed to take a deed from his client; but it is otherwise, if the client be the father of the attorney.

It is enough that undue influence is out of the question, as not being charged in the bill. The complainant cannot go beyond the allegations there. (*Gouverneur* v. *Elmendorf,* 5 *John. Ch. Rep.* 82-3. *James* v. *M'Kernon,* 6 *John. Rep.* 559.) All fraud is denied, and there is not the semblance of proof to establish it. To do away the answer, there should be two witnesses contradicting it, or, what is equivalent, one witness and potent circumstances. (*Woodcock* v. *Bennet,* 1 *Cowen's*

*Rep.* 711.) The pretended misrepresentations relate to Mrs. *Shurtliff*, and the affair of board and the law suit ; but *William* never saw her till after the deed, and could have made no representations on the subject. The farm must be lost, it seems, because certain facts were suppressed ; but it must be shewn first that they were known. The appellant talked to Mr. *Reynolds* about $5 per week for his wife's board ; but his knowledge was not and could not have been derived from *William*. All which was said as to this and the $100 debt, and the consequent danger of dissipating the estate, was mere matter of opinion, and not the subject of the *suppressio veri*. Nor is there evidence that the facts were untrue. This should be shewn, and that *William* knew them to be untrue.

*Charles Whelan* is obviously interested, and his testimony must be laid out of view. The appellant deliberately approved of what he had done, long after the conveyance ; and the case is stripped of every thing like surprise, the ground which Courts of Equity usually lay hold of, in these cases, to set aside conveyances, as in *Evans v. Llewellen*, (1 *Cox*, 333.) For 5 years the appellant had been saying to these respondents, " This farm belongs to you ;" and avowing his intention to convey it to them, among his neighbours. He did convey the same land in 1820. On *William's* falling sick, this was annulled. Every thing shews deliberation. We are told that he was alarmed by the summons and the law suit. Were these calculated to alarm a man worth $8000 ? He must have known that at the worst the recovery could not exceed $50 ; and the most that can be said is, that had it not been for the summons he would not have conveyed on that very day, but reserved the same act till some short time after.

Inadequacy of price is also insisted on. We ask a case where a deed from a father to a son was ever impeached for that cause. It might be a good objection in the mouth of a creditor ; but as between the parties, even had the deed been to a stranger, it could not be alleged, unless so gross as to shock the judgment. This is the ordinary case of an aged

agriculturalist withdrawing himself from active life, and pla-
cing his concerns in the hands of his children: It is calcu-
lated to excite no surprise—it is what thousands have done
before. The whole income of the estate would not maintain
the parents, if we add the expense of clothing and sickness.

It is said, that if the deed be void as to *William* it is so as
to *Joseph*. This is grounded on the rule, that if it be void
in part it is void in the whole. And we do not quarrel with
the principle; because, taken in its full extent, it is a two edg-
ed sword, and is accompanied with the qualification, that if
it be impossible to set aside a deed without doing as much
injustice as justice, the Court will not interfere. But the
principle does not apply, except the whole be acquired by
fraud ; as in *Huguenin* v. *Basely*, (14 *Ves.* 288) the case re-
lied upon. There were third persons claiming through the
fraudulent grantee. Nor does the rule apply when the good
can be severed from the bad. One gives a bond, in the pen-
alty of $3000, conditioned to pay three persons $500 each :
because one of the $500 happens to be for usury, shall it
destroy the honest claims of the others, which rest on distinct
grounds, and can be clearly ascertained and separated ? It
is the same of the present case, which is a deed to tenants
in common—their interests are distinct—each may eject,
give leases for their respective moieties, or distrain. Sup-
pose a deed executed to a fair purchaser and his fraudulent
attorney, conveying equal portions—would the Court set
aside the whole, in order to punish the attorney ? *William*
never requested a deed for *Joseph*, as to whom there is not
a pretence of influence, or even a request on his part.

In support of the third point, we refer to *Verplank* v.
*Sterry*, (12 *John.* 559) and *Sterry* v. *Arden*, (1 *John. Ch.
Rep.* 271.) The latter case was cited on the other side, as
stopping with the position that a voluntary conveyance may
be made good by marriage ; but it does not deny the same
effect as to deeds voidable on other grounds. We refer par-
ticularly to *Brown* v. *Carter*, (5 *Ves.* 862, 878.) There the
son, tenant in tail, just as he came of age joined his father
in charging the estate with £3000 for the use of the latter,
and in re-settling it, taking back to himself only an estate

for life, remainder to his first and other sons, &c. and he married and acquiesced till the death of his father ; and though there was no probability of issue, it was held, that all equity in favour of setting the conveyance aside was gone by the marriage, &c. and the conveyance was holden good even as against creditors. The Court say they would have interfered, had the marriage been out of the question. The principle of that case is, that the Court will protect marital rights with the greatest jealousy ; and is the same which governed a case of dower, in *Oliver* v. *Richardson*, (9 *Ves.* 222.) A settlement procured by a fraud in which the wife was not concerned, will be protected. (*Barrow* v. *Barrow*, 2 *Dick.* 504.) The principle of the latter case also applies not only to the wife of *Joseph*, but to himself. Both were strangers to the pretended fraud ; and indeed were ignorant of the whole transaction.

Here was long acquiescence on the part of the appellant, with which the marriages are undoubtedly connected. The wives saw the sons in possession, claiming title, and the father acquiescing. *Murray* v. *Palmer*, (2 *Sch. & Lef.* 479) is relied on, to shew that this cannot be urged ; but that was a case where the acquiescence was in ignorance of the party's rights, and induced by fraud.

A conveyance entirely without consideration, if there be no fraud, cannot be set aside, except by creditors, unless for duress. (1 *Mad. Ch.* 216, 324.)

*A. Spencer*, in reply. Three years ago the appellant was comparatively a wealthy farmer ; and the bill seeks to set aside an act by which he is stripped of every thing, and thrown upon the charity of his neighbours. Against this, several formal objections have been made. Our bill is sometimes too large, and sometimes to small ; but the Court will not listen to such objections, unless forced upon them. They often refuse to hear a point not made in the Court below. But in the progress of the cause they will find no difficulty in reaching the merits. We rely that the bill charges positive fraud ; and this is established in three ways—1. By the answer : 2. By positive proof : and 3. By the intrin-

sic nature of the transaction. We also rely, that the con-veyances were executed under delusion and misapprehen-sion, and that these were induced by misrepresentation or suppression of the truth.

As to the objection that our bill contains too much, we agree with the case of *Morris* v. *Burroughs*, cited from 1 *Atkyns*, 404, that the deeds cannot be avoided by subse-quent circumstances, considered merely as such ; yet they may be resorted to in order to shew *quo animo* the act was done, as you would look to an escape in a prosecution for felony. We use them here to shew an original design to deprive the appellant of subsistence. Indeed, the course has been acquiesced in by the respondents, who have not moved to strike out the matter for impertinence, and have even gone into proof upon that head. The fact, for instance, that *William* withheld the bond for the appellant's maintenance, is admitted in the answer, and *M'Call* gives evidence in re-lation to it. When required to pay the $50, an order on *Charles* for the use of the farm which *William* held in trust, is offered, or payment is refused till the old bond and mortgage are given up, though known to be good for nothing. They mal-treat the mother, and drive her from the house, refusing to make provision for her, falsely pretending inability to sup-port her away from home. And the answer, denying that they refused to pay *Wells* for her board, is directly contradicted.

Suppose the Court should think there is no charge of un-due influence in the bill, the utmost they will do is to order it dismissed without costs. (*Beekman* v. *Frost*, 18 *John.* 544.) *Cui bono*, then, is the objection made ? For the ben-efit of lawyers. I do not deny that the relief must be *secun-dum allegata et probata ;* but nothing technical is necessary. Though a bill properly consist of nine heads, and a matter may more properly be charged in the stating part, yet this requisition is merely formal, and it may be set forth in any other part, or collected from the whole bill. Originally the bill was a mere petition, containing the substance of the case, which is yet sufficient, though a more formal way is found convenient and safe for the pleader. If enough appear on the whole bill to warrant the relief, it will be granted. The

party is not under the necessity of using the epithet to characterize the influence made use of. It is enough that he state facts, without christening them *undue influence.* If the bone and marrow be found in the bill, it is enough. Undue influence is a conclusion of law which need not be stated, especially in Equity, where the rules of pleading are most enlarged and liberal.

I proceed, then, as to both heads of fraud and undue influence ; for they are blended in the bill. The appellant's age, emigration from *Ireland,* his property, the domestic broils in which he was involved resulting in a partial dismemberment of his family ; the quarrels among his children in relation to the use and management of his estate, the desertion of his wife in the fall of 1820, her going to Mrs. *Shurtliff's,* the suit for her board, the summons, the agency of *William* in that affair, his return, representing the charge of $5 per week for board, and the debt to *Campbell, William's* advice which is yielded to, going to *Reynold's,* having no intention to settle the estate, but induced by alarm and persuasion. These facts, charged in the bill and made out in proof, shew the appellant much in the power of the respondents. Great influence is inferrible, and which was exerted for a most pernicious purpose. The respondents were his sole reliance, and had the management of his property ; and had an overruling influence upon his mind. We admit and charge, that *William* was the only actor in the scene ; but it is singular that he should have kept the whole an entire secret, from *Joseph,* as he says in his answer. Both say they had the principal management of the appellant's affairs at the time ; both impute the strife in the family to disagreement between the appellant and his wife, the respondents being dutiful and attentive on their part. Both knew of the suit and service of the summons, and what took place on that occasion ; admitting that *William* went to *Shurtliff's,* denying that he had misled his father—companions throughout all these proceedings and acquainted with all, except the fact charged that *William* exerted his influence to procure an immediate conveyance—a very singular exception, at the least. *William,* in one breath, denies having charged his father and mother with dissipating the es-

tate; and in the next he admits it. The father then throws himself upon his son's advice. And suppose he had said nothing to influence him—nothing charged in the bill—but stood by and heard his father make the strange resolutions which he formed upon the imaginary terrors by which he was surrounded. Indeed, all this is admitted by the answer; and it is admitting what is equivalent to the matter charged. It cannot be evaded by the pretence that it is not the same. I charge fraud by false dice. This is denied in the answer, and attributed to false cards. Shall this form a defence, or shall it be taken for the same, in substance? Seeing his father deluded and fearful, he seizes the favorable moment; he does not, indeed, he says, use the words charged; but, "to save the farm, you must, if you have any thing to give, give it now." This in the absence of all the family. "I tell you, that as you and mother are acting, you will soon have nothing to give." Surely he admits substantially the whole that is charged. The whole of his answer, so far as particulars are charged, is conceived in falsehood, and not to be believed, except where it makes for us. It admits that his father stated to *Reynolds* his difficulty and danger, adding (falsely according to *Reynolds'* evidence) that he at the same time declared his previous intention to give his estate to his sons; and he might as well convey it at that time as any other. Both admit that the debts to be paid were trifling, which is indeed inferrible from their not shewing what they amount to. They insist on the conveyance as an advancement; and then, by way of negative pregnant, deny that the *only moving cause* was fear of the estate being dissipated, wrought through *William's* representations. Does not this admit that it was part of the moving cause? Accusing the appellant and his wife with waste and impending ruin, and urging him to give then, or that he would abandon the appellant, is admitted by *William's* answer. This, in itself, was the creation of an alarm which he knew to be false and ill founded. There was no conduct calculated to produce ruin, or to excite the barbarous threat of desertion on the part of *William*. Sometimes the answer insists on the deed as having been executed for a valuable consid-

ALBANY,
April, 1824.

Whelan
v.
Whelan.

eration ; at others, upon a spirit of love, affection, and advancement so excessive as to give every thing away to such dutiful children. The parties hurry off to a stranger, the appellant laboring under the delusion that every body at *Johnstown* was combined to ruin him—a stranger who could know and suspect nothing of the fraud ; and call upon him to draw the papers. *William* stands by and hears the lunatic and unfounded representations of his father to *Reynolds'*, giving them countenance and sanction by his silence, and joining in the request. Every thing was sudden ; and it is fairly inferable that all was moved by *William*, who the day before had returned from *Albany* ; and who must have told his father what he related to *Reynolds*. How could his father acquire this knowledge through any other channel ? *William* was the confidential agent who managed the entire business. The father looked for information no where else. But be this as it may, the man who stands by, and takes advantage of an erroneous impression, knowing it to be such and omitting its correction, is as guilty as the one who excites it. Add, then, the evidence of *M'Naughton* and *Charles Whelan*, and a strong case of undue influence and fraud is established.

*Charles* is not so far interested as to disqualify him. His expectations are no more than that of any child. He expects a child's portion. *Clary* mentions no other motive as being assigned by the appellant to *Reynolds*, than that of keeping his property away from his creditors and divesting himself of freehold. *William* answers as if the agreement to maintain his father was matter of previous arrangement ; but *Reynolds* says that the old man did not appear to expect any thing of that kind, till suggested by *William*, doubtless with a view to color the transaction. So perfectly confiding was the appellant, that he had not thought of indemnity ; and the answer of *William* is false in saying there was any agreement to that effect. Being false in so many particulars, this answer must be rejected in toto. It comes emphatically within the rule, *falsus in uno, falsus in omnibus*.

The facts bring these parties within the principle which required the whole of this business to have been done with

great deliberation, publicly, and under the advice of mutual friends. It is said we do not shew actual imbecility. This is not necessary. Here is a man 75 years of age. We have the authority of the constitution, that at 60 a man begins to go down hill ; and on this ground he is excluded from the superior benches of justice. The respondents should have rescued the appellant from the operation of this general rule, by shewing that he was an exception. Besides, credulity is a conformation of the mind as fatal as general imbecility. All the witnesses agree, that the appellant was very credulous and easy of persuasion to any purpose, especially by *William*. Cooper is relied on, that general opinion as to his state of mind is not enough ; but it is so *prima facie.* Inquiry into particulars belonged to the other side, who should have pointed their interrogatories in such a manner es to shew the conclusions of the witnesses destitute of premises. Not having done this, the intendment is that they are well founded.

Fraud consists of any thing which deceives another ; cunning, device, trick, suppression of truth in any manner so as to cloud the mind. Several cases have been cited, of a class which arises from the relation of the parties, and consequent influence. Seeing this situation, the law throws its shield around the party. It is objected that these cases do not apply to the appellant, going merely against the abuse of parental authority. What, if so ? What do we read cases for ? For the sake of the rule which they establish, to be applied to other cases coming within the principle of those cited. In *Gibson* v. *Jeyes*, (6 *Ves.* 266) an attorney had sold an annuity to his client, to the disadvantage of the latter ; and on a bill filed to set it aside, on the ground of the relation which existed between the parties, Ld. *Eldon*, (*p.* 278,) after enumerating the very great precautions under which alone such a sale could stand, and declaring that if the party would mix the character of vendor with that of attorney, he shall be holden to manifest that he has given all that reasonable advice against himself that he would have given against a third person, proceeds : " It is asked where this rule is to be found ? I answer in that great rule of the Court, that he

who bargains in a matter of advantage, with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence; *a rule applying to trustees, attornies, or any one else.*" Was the appellant dealing with one in whom he confided ? He then comes within the principle of the case cited. It is not even necessary that we should shew the abuse. It is enough to shew the confidence. In the language of Ld. *Eldon*, (*id.* 278) that circumstance throws upon the one in whom confidence is placed the whole *onus* of the case. He must shew affirmatively that every thing was fair. In *Chesterfield* v. *Janssen*, (2 *Ves. Sen.* 155-6) Ld. *Hardwicke* enumerates four species of fraud. The 2d. he says, " may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make, on the one hand, and as no honest or fair man would accept, on the other ; which are inequitable and unconscienscious bargains ; and of such even the common law has taken notice, for which, if it would not look a little ludicrous, might be cited 1 *Lev.* 3, *James* v. *Morgan*." A 4th. species of fraud, which he mentions and comments upon at large, is one arising from an attempt to impose on third persons, and from the relation of the parties ; and in the latter case he says fraud is matter of presumption to be rebutted by the other side. *Young* v. *Peachy*, (2 *Atk.* 258) goes fully to the same point. *Griffiths* v. *Robins*, (3 *Mad. Rep.* 191) will be found most strikingly analogous to the present, both in fact and principle. I invite the particular attention of the Court to that case ; and especially to the language of the Vice Chancellor. The whole is directly applicable ; and, if to be respected as authority, disposes of this cause. The case of *Gee* v. *Spencer*, (1 *Vern.* 32) is also directly applicable. There was a suit in Chancery touching a rectory owned by three sisters. The husband of one of whom, fearing to be in law, and made to believe that he should be forced to pay costs, released £1000, the arrears upon his share of the rectory, to the other two sisters who were to bear the charge of the suit. This release was set aside on the ground, *that a misapprehension*

*in the party shall avoid his release.* This case is cited with approbation in 2 *Powell on Cont.* 202.

*Lewis* v. *Pead*, (1 *Ves.* 19) cited on the other side, was decided by *Buller*, J. sitting for the Lord Chancellor; and though a good common lawyer, he was not familiar with the principles of Equity. Taking his decision, however, as authority, it is no more than that the age of 75 does not, *per se,* evince inability.

I thank gentlemen for the case of *Middleton* v. *Kenyon*, (2 *Ves. Jun.* 391.) It contains all our premises, and all our conclusions, though the transaction was affirmed. What is that case? The elder *Middleton*, having encumbered his estate by his extravagance, in order to relieve himself by raising a very large sum, parted with certain interests in an estate to his son, in consideration of the latter contributing his own interest in the same estate, to relieve his father. The conveyance was to three trustees, of whom Lord *Kenyon* was one, and a defendant in Chancery. The ablest counsel were consulted, and the whole affair was conducted with ample time, and the greatest deliberation; but after the best possible arrangement, the father took it into his head that there had been misapprehension; and that, too, after long acquiescence, and large interests acquired, *bona fide*, by third persons, in the course of executing the trust. At page 408, the Lord Chancellor lays down the precise ground upon which we go, that any bargain may be declared null, and set aside upon grounds of undue practice or influence exerted, or on the ground of mistake.

The force of the different pretences set up by the respondents—sometimes that the deed was for natural love and affection, and sometimes for valuable consideration—is shewn and illustrated by *Clarkson* v. *Hanway*, (2 *P. Wms.* 203.) The consideration appearing on the face of the deed, is a pecuniary one of $5000, the value probably which the respondents choose to fix on the bond and mortgage for maintenance, &c. and the case last cited shews that they cannot now press into their aid the consideration of natural love and affection, because it falsifies the deed. At least,

ALBANY,
April, 1824.

Whelan
v.
Whelan.

it strengthens the proof of fraud, by shewing that the deed carries a disguise.

As to the marriages, it is plain from the cases of *Sterry* v. *Arden*, (1 *John. Ch. Rep.* 261) and *Huguenin* v. *Basely*, (14 *Ves.* 273) that they cannot be taken into the account, provided there be fraud in the case, though a marriage may supply the mere want of a valuable consideration. But here there is no proof that the father ever heard of the intended marriages of the respondents, or that the wives ever heard of the conveyance ; and no injurious consequences or disappointment to them can arise from setting aside the conveyance. The respondents already had farms, to the purchase of which the father contributed.

The facts do not warrant the inference that *Charles* is a necessary party. The proof of the trust is by parol; and it resulted to the grantor, who had the sole direction of it between *Charles* and his children. It was not limited to him specifically, but to him or his children, as the father might direct. No interest passed out of the father, and it was not such a trust as *Charles* could enfore in a Court of Equity. (*Steere* v. *Steere*, 5 *John. Ch. Rep.* 1.)

The declarations of the appellant, made to witnesses before the conveyance, that he intended his property for the respondents, were general, and might as well relate to a will as to a deed.

WOODWORTH, J. The bill seeks to be relieved against two conveyances executed by the appellant—the one for a farm in *Johnstown*, the other for 100 acres of land in the county of *St. Lawrence.*

*Statement of the case.*

Relief is claimed, on the ground of undue influence and fraud. The respondents object, that the former is not alleged in the bill, and consequently not in issue.

*Ground on which relief is sought.*

*What the bill charges.*

The bill charges the respondents with fraudulent artifices, management, and undue influence, in obtaining the deeds. It is, however, sufficient, if from an examination of the whole bill, the facts stated shew that the respondents necessarily had undue influence or control over the appellant, so that the parties did not treat on equal terms. The rule that

*Undue influence is in issue, if it appear, from the whole bill, to be charged.*

ALBANY,
April, 1824.

Whelan
v.
Whelan.

It is an infer-
ence from facts
alleged    and
proved.

Leading fea-
tures  of  the
case.

requires every thing essential to the appellant's right to be alleged, is then satisfied. His equity will then appear, and the Court may administer the relief to which he is entitled. Whether undue influence has been used, is an inference from the facts alleged and proved, and does not require the averment of the pleader to put them in issue. It is enough if they authorize the Court to draw the conclusion.

I will briefly state some of the leading features of this case. The appellant is far advanced in years. He is probably not exempt from the infirmities incident to mind and body in the last stage of human life. In this second childhood, a surrender of business into other hands becomes indispensable. Something like a guardianship of the person and property is in most cases necessary. The appellant had reared a numerous family. For several years there appears to have been much family contention, arising from dissensions between his children, with respect to the use and management of his estate. The appellant's wife took part with some of the children. She and her husband lived unhappily, and separated. The bill alleges that the appellant had committed the management of his estate chiefly to his sons, *John, Joseph* and *William ;* that after his wife left her home, the farm was in the exclusive possession of the appellant and the respondents. It is in proof that the appellant was very credulous, and easily persuaded by those whom he believed his friends ; that he was easily led by *William ;* that in the family strifes the appellant and the respondents were on one side—the wife and the other children in opposition ; that the appellant could be persuaded to do any act dictated to him, when apprehensive that his property was in danger. It cannot be doubted that he was placed in a situation highly favourable to the views of the respondents. They had full opportunity for operating on his hopes and fears. A contract obtained from one party, so much in the power of the other, cannot be sanctioned, if confidence has been abused, if there is inadequacy of price, or the inference is plain, that advantage has been taken of age and imbecility, and the partiality of a parent has been artfully made use of to strip him of his property, and reduce him to a state of dependence and want.

Causes for a-
voiding a con-
tract—abuse of
confidence ; in-
adequacy   of
price ; advan-
tage from age
and imbecility;
and the par-
tiality of a pa-
rent.

It does not appear that *Joseph* was an active agent in procuring the deeds. The transaction was between the appellant and *William*. The first question is, whether fraud or undue influence was practised by the latter.

ALBANY,
April, 1824.

Whelan
v.
Whelan.

The farm is valued at $9000. The appellant's debts were trifling. His wife boarded with Mrs. *Shurtliff*. The bill alleges that she charged, as *William* stated, $5 per week for his mother's board; that the appellant was sued by her in a Justice's Court; that *William* observed, if his mother was permitted to go on in that way she would involve the appellant in debt, and dissipate his whole estate ; and that unless the appellant would immediately do something to prevent it, the respondents would leave him. That he asked the respondents what could be done. *William* advised the appellant to convey to him and his brother the whole estate real and personal. That to prevent such consequences he consented to the proposition.

The respondent *William*, in his answer, admits, that in *January*, 1821, he returned from *Albany* with the appellant, and found that Mrs. *Shurtliff* had commenced an action by summons. That the appellant asked him what should be done ? That he then told the appellant, as he had often done before, that if the appellant had any thing to give him he wished to know it, otherwise he would abandon the farm ; *that as the appellant and his wife were acting, they would soon have little enough for themselves.* That thereupon it was agreed that the appellant should execute a deed of the farm. The question here arises, what induced the appellant, *at this time*, to divest himself of all his property ? The answer is obvious—his fears that his estate would be swept away for debts contracted by his wife.

Appellant was induced to convey by undue fear that his property would be swept away by his wife's debts.

It is scarcely necessary to say that the supposition was groundless. His wife had been at board 13 weeks. The demand was afterwards settled for $25. A summons had issued to collect this small debt. This statement is enough to satisfy every mind that the appellant was bereft of ordinary understanding. If his ignorance and imbecility of mind were so great as to entertain such apprehensions, for such a cause, it is evident he would become an easy prey to any de-

ALBANY,
April, 1824.

Whelan
v.
Whelan.

*How treated by William, tho' he was bound to speak truly.*

signing knave who happened to possess his confidence. How does *William* treat these suggestions? Every motive of duty towards a parent required him not to give a false coloring. He was bound not only to speak, but to speak truly. But such a course would not answer the purpose in view. He had too much discernment not to perceive that this was the favourable moment to profit by the appellant's fears. Instead of quieting the idle apprehensions of his father, he renews his request. "If you have any thing to give, I wish to know it, otherwise I will abandon the farm"—and adds, that as the appellant and his wife were acting, they would soon have little enough for themselves. The impression such remarks were calculated to make cannot be mistaken. It was, in substance, saying, "Your estate will be dissipated by the expense of supporting your wife, and the only way to avoid it is to give me your property." The allegation was untrue in point of fact. There was no ground for alarm. The

*His conduct undutiful and fraudulent.*

conduct of *William*, on this occasion, was not only undutiful, but fraudulent. The appellant was thereby deceived, and became the dupe of the artifice practiced on him. The proceedings at Mr. *Reynolds'* office are in exact accordance with the view I have taken. *William* admits that the appellant stated to *Reynolds* he was apprehensive his wife would run him in debt; the merchants would trust her; that he understood he should be charged $5 per week for her board; that he was determined to get rid of all his estate, so that he could not be kept in gaol but a short time.

The question here occurs, from whom did the appellant derive his information? *Reynolds* testified, that the appellant stated he had been prosecuted for the maintenance of his wife; that a recovery had been had against him; and he was fearful he should be harrassed with law suits, from time to time, for his wife's board and maintenance. He believed the above were among the inducements to convey his estate. *Clary* testified, that the appellant declared he made the conveyance for the purpose of saving it from his wife's creditors. *William* stands by, and does not attempt to remove these erroneous impressions. Had the business been fairly explained, I doubt not that Mr. *Reynolds* would have informed the appellant

there was no cause for alarm. The next day, when the bond and mortgage and bill of sale were executed, *M'Naughton* testifies, that the appellant declared it was a *hard case* for him to make an assignment of his property—it was done for the express purpose of preventing *Martha*, his wife, from spending his estate. Here also *William* is silent. He suffers his father to remain under the delusion. He perceives his unwillingness to reduce himself from affluence to dependence; and yet quietly takes possession of the papers, and permits the fraud to be carried into effect. A strong confirmation of the fraudulent intentions of *William* is derived from his declarations to *Charles Whelan*, in 1823. " He had got the old man into the situation he wanted—that he had worked to get the appellant into that situation for these ten years."

There is another fact that marks the influence of *William* over the appellant, as well as his incapacity to protect himself. Mr. *Reynolds* says, after the appellant had conveyed his property to the respondents, he appeared not to be prepared or anxious to exact a stipulation from them for the support of himself and wife, until the propriety of this had been suggested to him. At length a bond and mortgage were prepared, with condition to give the appellant and his wife a comfortable support, in sickness and in health, and the sum of $50 annually, during life ; but that the respondents should not be required to provide such support, except in their own dwelling-houses, which they or one of them should occupy. As the appellant seemed not to have thought of any consideration to be paid, nor anxious to require any, he was of course willing to accept any thing *William* would give. The spectre, of law suits, his wife's debts, and imprisonment, had so haunted his imagination, that his own future support seems to have been lost sight of ; or, if not, he reposed on the filial affection of his favourite sons. The consideration, then, was grossly inadequate, and not suited to the exigency of the case. It may well be considered as one item that gives the character of fraud to this transaction. There is no ground for upholding this deed on the principle that this was an advancement, or that it was founded on natural love

*Consideration inadequate.*

*Conveyance cannot be upheld as an advancement.*

ALBANY,
April, 1824.

Whelan
v.
Whelan.

Principles on
which equi-
ty will re-
lieve.

One making
a representa-
tion to another,
dealing on the
faith of it shall
make it good.

One bar-
gaining with
another, pla-
cing confidence
in him, must
show a reason-
able use made
of that confi-
dence.

One falsely
supposing his
estate in dan-
ger conveys it
to sons for that
cause, the lat-
ter knowing
the supposi-
tion to be
groundless and
neglecting to
correct the
mistake; this
should avoid
the convey-
ance.

and affection. All the declarations of the appellant of his intentions respecting the respondents, must be considered as relating to his future bounty. They can have no effect in supporting the present deed.

The principles which govern a Court of Equity, abundantly prove that the appellant is entitled to relief. In *Evans* v. *Bicknell*, (6 *Ves.* 182) the Chancellor observed, it is a very old head of Equity, that if a representation is made to another person, going to deal in a matter of interest, upon the faith of that representation, the former shall make that representation good, if he knows it to be false. So also in *Gibson* v. *Jeyes*, (6 *Ves.* 278) it is laid down as a general rule in Equity, that he who bargains in matter of advantage, with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying to trustees, attorneys, or any one else. We cannot shut our eyes to the fact that *William* well knew, that the appellant's large real estate was not in danger of being wasted, by the inconsiderable expense of paying his mother's board in the country, and supplying her wants for a few years; she then being nearly seventy years of age, and in delicate health. The supposition would be puerile, and inconsistent with the intelligence and management discovered by *William*, in effecting his object. The appellant, in great distress, makes inquiry what is to be done? He seems to be entirely ignorant, that his estate and person were not in danger. *William* had the power to make known to him his true situation, but he withholds the information. It would therefore be unconscionable to hold the appellant to the bargain; this concealment is alone a sufficient ground for avoiding it. When transactions of this kind are between parties standing in such relations to each other, they ought to be conducted with all imaginable fairness. In *Bowles* v. *Stewart*, (1 *Sch. & Lef.* 209) it was held, that concealment of a material fact was sufficient to avoid a release obtained by the person whose duty it was to make the disclosure. I fully subscribe to the reasoning of Sir *Samuel Romilly* in *Huguenin* v. *Basely*, as applicable to this part of the case; that "if the Court sees that any arts or stratagems, or any

undue means have been used ; if it sees the least speck of imposition at the bottom ; if there be the least *scintilla* of fraud, this Court will, and ought to interpose ; and by the exertion of such a jurisdiction, they are so far from infringing the right of alienation, which is the inseparable incident of property, that they act upon the principle of securing the full, ample and uninfluenced enjoyment of it."

From this examination, it seems to me, there is little difficulty in deciding that the respondent *William* procured the deed from the appellant to the respondents by fraud and imposition ; and that so far as he is concerned, it ought to be held utterly null and void.

The next question is whether the fraud of *William* in procuring the deed, renders it void as to *Joseph*, the other respondent. It is a general rule, that in ordinary cases of fraud, Equity undoes the whole transaction, and replaces the parties in their former situation. (*Daubney* v. *Cockburn*, 1 *Mer.* 644.)

The case of *Bennet* v. *Wade*, (1 *Dickens*, 84) is very much in point. The facts were briefly these : Sir *John Leigh* was seized of a large real estate ; his mind was so weak, that he was easy to be imposed upon ; the defendant was a surgeon and apothecary, who attended him, took advantage of this weakness, and prevailed on him, then aged sixty, to marry *Wade's* daughter, aged sixteen, and to execute a settlement in favor of his daughter. The daughter dying soon after, *Wade* obtained a will from Sir *John* in his favor, and also indentures of lease and release as he alleged in consideration of the will. After the testator's death, *Wade* set up the deeds, *under which the defendants claimed beneficially*, and they entered on the estates. A part of the estate was conveyed to *Wade* in fee ; a bill was filed to set aside the deeds, and a cross bill to establish them. It was argued on the part of the plaintiffs, that whatever fraud or imposition had been practised on Sir *John Leigh*, by the defendant *Wade*, they were not privy to, or concerned in it ; that it would be hard to involve the innocent with the guilty, and punish them, by setting aside the deeds *in toto*. But Ld. *Hardwicke* was of

Vol. III. 74

*Margin notes:*

ALBANY,
April, 1824.

*Whelan*
v.
*Whelan.*

*William* procured deed by fraud, and it should be set aside as to him.

Whether his fraud avoids it as to *Joseph*. In ordinary cases of fraud, equity undoes the whole transaction.

Cases to this point.

ALBANY,
April, 1824.

Whelan
v.
Whelan.

opinion, that the deeds were founded in fraud, and being so, it vitiated the whole; that they were obtained from Sir *John Leigh*, by fraud, imposition and circumvention, by means of the undue influence of the defendant *Wade* over his weakness; and that the same ought to be set aside. This case fully establishes the principle, that the respondent *Joseph* cannot be protected. So, also, in *Davidson* v. *Russell*, (2 *Dickens*, 761) the question was, whether a deed could be set aside in part for fraud, and the rest established. Ld. *Thurlow* was decidedly of opinion it could not. He directed the contract to be set aside, and observed, there could be no hesitation; though it appeared that innocent persons were interested under it. This cause was afterwards reheared and affirmed by Ld. *Loughborough*, in 1794.

In *Huguenin* v. *Basely*, (14 *Ves. Jun.* 289) the same doctrine is recognized. Ld *Eldon* observes, " I should regret that any doubt could be entertained, whether it is not competent to a Court of Equity to take away from third persons the benefits which they have derived from the fraud, imposition or undue influence of others." The case of *Bridgeman* v. *Green*, (2 *Ves.* 627) was considered by his Lordship as an express authority that it is within the reach of the principle of this Court, to declare that interests so gained by third persons cannot possibly be held by them. This last cause afterwards came before the Lords Commissioners, and Lord Chief Justice *Wilmot* expresses himself thus : " There is no pretence that *Green's* brother or his wife, was party to any imposition, or had any due or undue influence over the plaintiff; but does it follow from thence, that they must keep the money ? No. Whoever receives it must take it tainted and infected with the undue influence and imposition of the person procuring the gift. His partitioning and cantoning it out amongst his relations and friends, will not purify the gift, and protect it against the equity of the person imposed upon. Let the hand receiving it be ever so chaste, yet if it comes through a polluted channel, the obligation of restitution will follow it." (*Wilm.* 64. 14 *Ves.* 289.)

It is unnecessary to pursue this doctrine through all the cases, to be found in the books. It is believed that the rule is

firmly established. If it were otherwise; that a person could evade the principle, by giving interests to third persons, instead of reserving them to himself, it would be almost impossible ever to reach a case of fraud. The deed, then, is bad *in toto*, and must be set aside as to both the respondents.

But it is contended, that in as much as the respondents were unmarried at the time the estate was conveyed, and afterwards married, and the appellant declared to the friends and connexions of their wives that the respondents were the owners of the estate, it would be against public policy and contrary to equity and good consciense, to permit him now to avoid that conveyance.

The evidence of *Thomas Goff* is, that in 1820 the appellant stated that he intended to convey all his property in *Johnstown* to the respondents. *Catharine Goff* testified, that the appellant said he had conveyed or intended to convey his farm. But there is no testimony that any declarations were ever made to the respondents' wives, before their marriage; nor does it appear that the conveyance made by the appellant was among the inducements to the marriage. Indeed. it does not appear that they had any previous information or knowledge respecting the transaction between the appellant and the respondents.

The facts, then, do not present the question raised by the counsel, or form any objection to the interference of the Court. Marriage is a valuable consideration ; and if the grantee of a voluntary deed gains credit by the conveyance, and a person is induced to marry on account of the provisions made in the deed, the conveyance, on the marriage, ceases to be voluntary. This principle was decided in *Sterry & wife* v. *Arden & others*, (12 *John*. 536.)

In the case of *Barrow* v. *Barrow*, (2 *Dickens*, 504) cited by the respondents' counsel, it was held that a settlement in consideration of marriage, procured by fraud and imposition in which the wife was not concerned, should not be set aside. In that case, the daughter of the person who practised the fraud revolted at first, but was prevailed on to marry the person who made the settlement, although his intellects

Whether the marriage of respondents should affect the question.

No evidence that marriage was induced by conveyance.

Therefore, it can have no influence.

Marriage is a valuable consideration.

A voluntary deed ceases to be so, if a marriage be induced by its provisions.

Case of a fraudulent settlement made good by marriage.

ALBANY,
April, 1824.

Whelan
v.
Whelan.

were quite impaired, and he in a state of childhood. The Court refused to interfere, on the ground that there was a valuable consideration proceeding from the party not privy to the fraud.

All persons concerned in the demand, or who may be affected by the relief prayed, ought to be parties, if within the jurisdiction of the court.

Charles not a necessary party, for he could not enforce the execution of the trust.

The remaining inquiry, is whether Charles Whelan is a necessary party, in consequence of the deed given by the appellant to William in trust for Charles. All persons concerned in the demand, or who may be affected by the relief prayed, ought to be parties, if within the jurisdiction of the Court. The question here, is whether Charles Whelan, could enforce the execution of the trust. If he could not, he is not a necessary party. The farm in St. Lawrence county, on the face of the agreement was conveyed unconditionally to William. He admits in his answer, that he agreed to convey it to Charles, as the appellant should direct. There was no declaration or evidence of trust in writing. and the deed is absolute. This case cannot be taken out of the statute of frauds. A trust need not be created by writing, but it must be manifested and proved by writing. The nature of the trust, and the terms and conditions of it, must sufficiently appear ; so that the Court may not be called on to execute, the trust, in a manner different from that intended. (Steere. v. Steere, 5 John. Ch. 12. 3 Ves. Jun. 696, Foster v. Hale.) It follows then, that Charles Whelan could not compel the execution of the trust. The deed for the St. Lawrence farm, rests on the same foundation as the conveyance to the respondents jointly. I am of opinion, that the decree of his Honor the Chancellor be reversed ; and that a decree be entered, declaring, that the deed from the appellant to the respondents for the farm in Johnstown, and the deed to William Whelan for the St. Lawrence farm, be annulled and held for nought, and that the appellant recover against the respondents his costs in the Court below, to be taxed.

A trust must be manifested and proved by writing.

SAVAGE, Ch. J. BOWMAN, BOWNE, BURROWS, BURT, CLARK, CRAMER, EARLL, GARDINER, GREEN, HAIGHT, KEYES, MALLORY, M'CALL, M'INTYRE, MORGAN, NELSON, STRANAHAN, THORN and WHEELER, Senators, concurred.

SUDAM, Senator, went into a very full examination of the pleadings. He said the points for the consideration of the the Court are—

1. Whether the conveyance of the 19*th January*, 1821, was fraudulent and void, by reason of *William's* false representations; or by his suppression of the truth when he was bound to speak.

2. If not, was the appellant so much under the influence of the respondents, or either of them, that the conveyance was not the execution of a free, unbiassed purpose of bounty?

3. Whether the Court can compel a re-conveyance of the *St. Lawrence* farm; *Charles Whelan* not being a party to the bill.

Upon the first point he went at large into the facts connected with and immediately preceding the conveyance, as those upon which the opinion of the Court must rest. The subsequent transactions, he said, may be regarded as circumstances, but not of primary importance, in the decision of the cause. They may aid in the conclusion, but cannot be the basis of our judgment. The *Johnstown* farm was worth at least $8000, and the personal property there amounted to about $400; but there is no evidence as to the value of the *St. Lawrence* farm, or the personal property upon it. The respondent was 74 years of age, and his wife about 67, at the time of the conveyance. According to the admissions of the answers, he had, some time previous to the spring of 1819, resigned the charge of his real estate at *Johnstown* to his sons, *John, Joseph* and *William*; the reason of which, as stated by *William*, was to make them men of business; though *Joseph* says he did not know the reason. How long they had occupied the farm does not appear. In 1819, *Carr*, the appellant's son-in-law, came into possession, and occupied it till the fall of 1820; when all the children then at home, except the respondents, removed to *Indiana*, leaving the respondents in full possession, with the appellant. About the same time, *Martha*, the appellant's wife, left the house, and took lodgings with Mrs. *Shurtliff*. The respondents admit there had been dissension in the family, but

*Margin notes:*

ALBANY, April, 1824.

Whelan v. Whelan.

Points.

Evidence as to fraud.

deny, in the first part of their answer, that it arose from dis-agreement as to the management of the farm. In *June,* 1820, the appellant had, of his own motion, executed a deed of the farm in question to *Joseph* and *William,* taking a bond and mortgage from *William* alone, for $3000. These papers were drawn at *Johnstown,* and the transaction was known to *Joseph.* In *September* following, *William* being dangerously ill, this was rescinded, on the mere request of the father, the respondents releasing to him all their right; the appellant thus becoming re-seized of the farm about the time his wife and children left him. Cut off from all communication with the rest of his family, the appellant continued to reside with *Joseph* and *William* till *January,* 1821 ; when, on the latter returning from *Albany,* they found the copy of the summons from Mrs. *Shurtliff.* In relation to this, *William* admits that his father asked him what was to be done ; to which he re-plied, *and had often told him before,* that if he had any thing to give him he wished to know it, otherwise he would *aban-don the place*—that as the *appellant and his wife were acting, they would soon have little enough for themselves.* That it was then agreed, as the father had long intended, to execute the conveyance and bill of sale. On the 19*th,* *William* and his father, with *John Clary,* who appears to have been a mu-tual friend, went to the office of Mr. *Reynolds,* an attorney and counsellor at law, an entire stranger, 10 miles miles dis-tant, for the purpose of having the proper conveyances drawn. *William's* answer, as to what passed there, concurs, in the main, with the evidence of Mr. *Reynolds* as to the cause of the conveyance. That it was owing to fear of the wife's extravagance, and the consequent law suits. But *Rey-nolds* omits the declaration of the father, set up in the an-swer, that he had intended the farm for his sons, and might as well give it to them to-day as to-morrow ; and his mentioning the consideration he was to receive. So far from this, he ap-peared not to be prepared or anxious to exact any stipula-tion from the respondents, for his and his wife's mainten-ance, till the propriety of this had been suggested to him ; and then he and *William* agreed on the bond and mortgage.

This is the evidence of a person wholly disconnected with the parties, swearing in direct contradiction to *William*, as to any *moving cause* beyond the fears of the father. If the conveyance was the mere consummation of a prior intent, why did the appellant divest himself of all his real estate, including that in *St. Lawrence ?* And where is the force of the other motive assigned by *William*, that the appellant wished to divest himself of all freehold, to evade imprisonment for debt; when the respondents both admit that they were to pay all subsisting debts, and were to prevent future ones by maintaining both the appellant and his wife ? It is clear that the appellant acted under erroneous impressions in regard to his legal liability ; that his object was not to advance any of his children, or settle his estate. But he conveyed because he believed, from information, that it was necessary to prevent his estate being squandered by his wife, and to ensure only a temporary imprisonment for debts contracted by her. *John Clary's* testimony goes distinctly to these two causes. True, according to his testimony, the appellant protested to God, that a child belonging to him should not have one cent, except the respondents ; for *the others had robbed him of all he had, and had not left him a chair to sit on.* This declaration is made at the very moment when he is conveying a valuable estate in *Johnstown*, and a farm in *St. Lawrence*, with the personal property there, for the use of his son *Charles.* If this evidence proves any thing, it is, that the appellant was influenced by considerations different from those set up by the respondents ; and, indeed, that he knew not what he said, or what he did. His declarations were directly at variance with the truth and with his acts. He declared that he could not trust the people of *Johnstown ;* which was the reason of his applying to Mr. *Reynolds.* *Clary* was also present when the bill of sale was executed, and he states that the reasons for this were the same as for conveying the real estate. This comes from a witness produced by the respondents. *M'Naughton* was also present with all the parties, and witnessed the bill of sale and bond and mortgage ; and the appellant complained that his case was a hard one ; that

the whole was done for the express purpose of preventing his wife from spending the estate.

Was here, then, misrepresentation by *William*, or a studied silence on the part of the respondents when they ought to have spoken, which led to and confirmed the opinion of their father in the fancied danger to his estate? Had *William* before said any thing to strengthen that opinion? Upon a careful and laborious analysis of the evidence, I am of opinion that the appellant's case has been made out, on this point. The sole management of the appellant's affairs was in the hands of his sons. Aged, weak, credulous and solitary, he looked to them for advice. Deserted by the rest of his family, whom he abhorred for fancied injuries, and to whom he believed he could never be reconciled, he was left dependent upon these two sons. To the feuds and distractions of his family, was added the pursuit of his property by legal process. He goes for advice and consolation to *William*, the most favoured of his two remaining children, and the one in whom he particularly confided. And who but *William*, under such circumstances, would have added poignancy to a father's wretchedness by a threat of desertion mingled with harsh reproof, and by advice which was immediately followed by a conveyance of his estate? The facts which the appellant stated as the cause of the alarm which led to the conveyance, must have been derived from one or both of the respondents. At any rate, his fears were countenanced by them both. Both were present when the bill of sale and mortgage were executed, and both then heard the true cause assigned by the appellant. As his children and confidential agents, they were bound in duty to set him right, and to see that he did not act upon such motives. In my opinion, here was palpable delusion and fraud; and the deed should be set aside for that reason.

*The evidence shews fraud, and deed should be set aside for that reason.*

I have arrived at this conclusion, independent of *Charles Whelan's* evidence. Though I think him competent, the prospect he has of a portion of his father's property, and his stating a conversation between him and *William* alone, undoubtedly go to his credit; yet he is so entirely supported by the other facts, I think him entitled to much credit. And

*How far Charles Whelan is to be credited.*

if he is to be believed, the case presents positive proof of a pre-concerted fraud, compassed by the labour of years.

2. But there is another point in the cause well worthy of consideration. It is that the respondents had an undue influence over the appellant, to such an extent as to preclude our saying that he conveyed the farm and personal property at *Johnstown* as a free, unbiassed act of bounty.

2d point.

The counsel for the respondents meet this point, firstly by saying that it is not made a substantive allegation in the bill; and if this be so, it cannot be available here. The bill charges, that the appellant was led to convey by the false representations and persuasions of the respondents that his wife was spending the whole estate—that he conveyed not for the purpose of making a settlement or disposition of his estate, but for the purpose of removing it out of her reach—and that there was no other moving cause for the conveyance than the persuasion and representation of the respondents that such a step was absolutely necessary to prevent the estate being dissipated by the mother. The bill also states the dissensions in the family, with their cause, and the manner in which the appellant lived with the respondents. The parties have gone on to examine witnesses to the point of undue influence, and I think properly ; for, in my opinion, it is substantially involved and sufficiently stated in the bill, though not named undue influence, in terms.

Whether undue influence is put in issue.

Charging it substantially, without calling it *undue influence*, is enough.

I have already adverted generally to the situation of the property and the family, their dissensions and ultimate dispersion, and the age of the appellant and his wife, the latter of whom was in delicate health for several years, of an irritable and peevish disposition, and had taken part with several of the children, against their father, in the dissensions of the family, which arose relative to the use and enjoyment of the real estate at *Johnstown*. The answers admit, that previous to the lease of 1819, under which *Carr* possessed the farm, *John, William* and *Joseph* had the management of it, and that during this lease, the appellant and respondents resided in a log house, on the same farm, while the wife resided with *Carr*, at the homestead. The answers admit the previ-

Evidence of undue influence.

ALBANY,
April, 1824.

Whelan
v.
Whelan.

ous agency and management of the estate, the separation of the family during the lease, and its dispersion after the lease had expired; virtually saying that the appellant was under the keeping of the respondents, and residing with them for some years previous to the transaction in question. It is abundantly in proof, that the appellant was a credulous man, and easily led, especially by *William*, who, with *Joseph*, uniformly took sides with his father, in the dissensions of the family, against its other members. Taking into account the age of the appellant, the double relations of parent and child and principal and agent, the general credulity of the appellant, and the ease with which he might be led by *William*, connec-

The case is brought within the principle of those authorities which disallow a contract between persons standing in certain confidential relations to each other.

ted with the circumstances attending the conveyance, and the case is brought most emphatically within the principle of those cases cited by the counsel for the appellant which forbid a contract between persons holding certain relations to each other, which imply, from their nature, an influence and confidence too great to be trusted in the hands of one who may wield them to his own advantage. It was, indeed, truly said at the bar, that no case had been shown in which a conveyance from a parent to one of his children had been set aside for these or the like causes ; but that relief had been refused in such cases. These refusals were in cases of English family settlements, where provisions were made for children, which the Court adjudged to be reasonable in reference to the estate of the party making the settlement. No case can be cited, in which an aged man, under the custody and influence of one of his relations, disposed of his whole estate to such relation in exclusion of others having equal natural claims upon his bounty, where a Court of Equity would not look into the transaction with an eagle eye. Besides, the English decisions are doubtless influenced by their law recognizing the rights of primogeniture and entailment. In this country these rights are unknown. But it is not sought here to avoid the deed, because the whole property is given to the respondents. That the appellant clearly had a right to do, if he chose. But the objection is, that when he made this conveyance he was, and had been for some time, so much under the influence of the respondents, that he would take their

suggestions as his rule of conduct; so that the conveyance was not his act but theirs—it was not the result of his own free will, but an act done under the pressure of circumstances, aided by the suggestions or advice of the respondents. At any rate, they made no attempt to correct the erroneous impressions under which the appellant laboured, though they were acting as his agents in relation to his real and personal estate, and indeed were bound to this by other powerful considerations of duty. They have, in a word, betrayed the trust and confidence reposed in them, and made a profit of their treachery. This view of the case is, I think, fully supported by the answers and evidence. It is also a remarkable circumstance, that this conveyance was only about 4 months after the re-conveyance to him of this very property, by *William*, of whom he had before taken a bond and mortgage of $3000. The first conveyance, it seems, was for fear of a judgment, and the property was, on the appellant's request, surrendered by the respondents. According to their account, they received the first deed without inquiry, *William* alone gave the mortgage, and the whole property was readily surrendered. Would these things have taken place, if, as pretended, it had been the long and settled purpose of the appellant to convey by way of advancement? The truth seems to be, that he had surrendered himself as well as his estate, to the charge of the respondents. His age, his education, his infirmities, and his passions, all combined to make him a fit subject to be operated upon by trifling causes. He had no benefit from the advice of counsel, or of any one except *Clary*, who was also the friend of the respondents. From these considerations, followed by the hurried, secret and suspicious manner in which the business was transacted, I feel constrained to say, that if there ever was a case in which a Court of Equity ought to avoid a deed for undue influence, this is one.

3. *William* having submitted, in his answer, to re-convey the *St. Lawrence* farm, and there being no written declaration of trust, I can see no reason why we should not adjudge a re-conveyance. On a bill filed by *Charles*, or his children, *William* might set up the statute of frauds, and de-

*ALBANY,*
*April, 1824.*

Whelan
v.
Whelan.

Deed void for undue influence.

*Charles Whelan* not a necessary party.

feat a conveyance; and he admits that this farm was given to him in trust for such purposes as the appellant should direct.

Though *Joseph* appears only to have assented to the act of *William*, yet I think the deed is void as to both.

I am, therefore, of opinion, that the decree of his Honor the Chancellor should be reversed; and that a re-conveyance of the two farms should be decreed.

For reversal, 23—for affirmance, 7.

BRONSON, DUDLEY, LYNDE, REDFIELD, WARD, WOOSTER and WRIGHT, Senators, dissented.

A majority of the Court being for a reversal, the following order was thereupon entered:

" It is ORDERED, ADJUDGED and DECREED, that the decree of the Court of Chancery, appealed from, be and the same is hereby reversed. And it is further ORDERED, ADJUDGED and DECREED, that the deed and conveyance executed by the appellant to the respondents, on the 19th day of *January*, 1821, and in the pleadings in this cause mentioned, whereby the appellant conveyed to the respondents, in fee, a certain farm of land in the town of *Johnstown*, in the county of *Montgomery*—and also another deed and conveyance executed by the appellant to the respondent *William Whelan*, on the day and year last aforesaid, and also in the said pleadings mentioned, and whereby the appellant conveyed to the said *William Whelan*, one of the respondents, in fee, a farm of land in the county of *St. Lawrence*—and also a bill of sale of certain personal property, executed by the appellant to the respondents, and also in the said pleadings mentioned —are, and the same are hereby declared to be, respectively, fraudulent, null and void. And it is further ORDERED, ADJUDGED and DECREED, that the respondents forthwith deliver up to the appellant the said several and respective deeds, to be cancelled; and that the respondents, also, by a competent deed of conveyance for that purpose, release and convey to the appellant, in fee, all their right, title and interest, of, in, and to the said farm of land in the said town of *Johnstown*, in the said pleadings mentioned, with proper and

apt covenants against their own acts and transactions, since the said 19th day of *January*, 1821, whereby the title to the said farm may be impaired, or in any wise encumbered. And it is further ORDERED, ADJUDGED and DECREED, that the respondent *William Whelan*, in like manner, release and convey to the appellant, in fee, all his right, title and interest, of, in, and to the said farm in the county of *St. Lawrence*, in the said pleadings mentioned, with like covenants; the said deeds to be settled by a Master of the Court of Chancery, if the parties disagree respecting the same. And it is further OR-DERED, ADJUDGED and DECREED, that it be referred to a Master, to take and state an account of the value of the annual rent of the said farm in *Johnstown*, from the said 19th day of *January*, 1821; in which account the respondents shall be debited the value of the said rents from the said time until the taking of such account, if the respondents shall then be in possession of the said farm; but if they shall have yield-ed up the possession thereof to the appellant, then to the time of so yielding up the same; and the respondents shall be credited for the board, maintenance, support and cloth-ing of the appellant and his wife, during the time they or either of them were maintained and supported by the res-pondents, since the said 19th day of *January*, 1821; and the respondents shall also be credited for any moneys paid to or advanced for the said appellant, since the day and year last aforesaid; and, also, that the respondents be credited the balance of any permanent and beneficial improvements made on the said farm in *Johnstown*, since the said 19th day of *January*, 1821. And the said Master shall also take and state an account of the value of the goods and personal pro-perty conveyed by the said bill of sale, by the appellant to the respondents, and which have been sold, disposed of, or ap-propriated to the use of the respondents, and which shall not be delivered up by the respondents to the appellant before the taking of such account. And it is further ORDERED, ADJUDGED and DECREED, that the appellant shall deliver up to the respondents to be cancelled, the bond and mortgage given by them to the appellant to secure the maintenance of the appellant and his wife, and mentioned in the pleadings

in this cause. And it is further ORDERED, ADJUDGED and DECREED, that the appellant recover of the respondents his costs to be taxed in the prosecution of this suit in the Court of Chancery, and that this cause be remitted to the Court of Chancery, to the end that this decree may be carried into execution."