WILSON (POTTER v.). See Case No. 11,342.

---

## Case No. 17,828.

### WILSON v. PREWETT et al.

[3 Woods, 631.] [1]

Circuit Court, N. D. Alabama. April Term, 1878. [2]

MARRIAGE SETTLEMENT — VALIDITY — FRAUD ON HUSBAND'S CREDITORS—EVIDENCE.

1. To make an ante-nuptial settlement void as a fraud on creditors, both parties to the settlement should concur in, or have notice of the intended fraud.

2. The husband and wife, parties to such a settlement, are deemed, in the highest sense, purchasers for a valuable consideration.

3. But if the settlement is not bona fide, the fact that it is made for a valuable consideration will not save it.

4. A marriage settlement cannot be made a cover for fraud. If the purpose is to delay or defraud creditors, and both parties are cognizant of it, the consideration of marriage will not support the settlement.

5. If the amount of property settled is extravagant, or grossly out of proportion to the station or circumstances of the husband, and he is embarrassed by debt, and the other party knows it, this, of itself, is sufficient notice of fraud.

6. To ascertain the purpose of the grantor in a marriage settlement, evidence of fraudulent transfers by him to other persons at or about the time of the settlement, is admissible.

7. Actual knowledge, on the part of the prospective wife, of the fraudulent purpose of the grantor in the marriage settlement, is not necessary to avoid the deed. A knowledge of facts sufficient to excite the suspicions of a prudent person and put her on inquiry, amount to notice, and are equivalent to actual knowledge.

8. P. was indebted in the sum of about $90,000, and owned property worth about $50,000. In alleged consideration of marriage, he conveyed to his prospective wife property of the value of $32,776, and in addition thereto, he conveyed to her other property of the value of $13,300, to be held by her in trust for two favored creditors. This conveyance included all

his property, except three thousand six hundred and eighty acres of land worth two dollars per acre, which was covered by a deed of earlier date which had never been canceled. The deed of marriage settlement left $70,000 of debts unprovided for. The prospective wife knew, before the marriage and before the execution of the marriage settlement, that P. was embarrassed by his debts, and for that reason had demanded an ante-nuptial settlement before she would consent to marry him. *Held,* that the deed of settlement was in fraud of creditors and void.

9. Where a deed in favor of two persons is obtained by the fraud of one, although without the privity of the other, the deed is void as to both.

In equity. Heard on pleadings and evidence for final decree. The purpose of the bill was to obtain a decree of the court, setting aside as fraudulent, and null and void, a marriage settlement, made on April 27, 1866, by the defendant Richard Prewett, on Josephine Prewett, whom he afterwards, on May 6, 1866, married. Prewett was fifty-eight years of age. About the first of February, 1866, he proposed marriage to Josephine Prewett, who was the widow of his nephew, and was twenty years of age, and childless, and was the owner of property worth less than $1,000. Josephine Prewett consented to marry him. A short time afterward, for what reason the evidence did not disclose, she wrote Prewett, withdrawing her consent to marry him. About the first of April following, Prewett renewed his addresses. Josephine again agreed to marry him, this time on condition that he made a settlement of property upon her, in consideration of the marriage. To this Prewett assented, and agreed to settle on her a large amount of real estate and some personal property, but without specifying any particular property. On April 27, Prewett executed the deed of marriage settlement, which is attacked in this case. It conveyed to Josephine Prewett, in consideration of the contemplated marriage, real estate which it is conceded was worth $30,000, and personal property worth $2,776. The lands lay partly in Franklin county, but mainly in Lawrence county, Alabama. The personal property conveyed embraced live stock, farming utensils, household furniture and seed cotton, all on the land conveyed. At the date of the marriage settlement, Prewett was indebted in the sum of $90,000. Property of the value of $13,300, in addition to that already mentioned, was conveyed by the deed of settlement, to be applied to the payment of $18,000 of this indebtedness. No other provision was made by Prewett for the payment of his debts. The deed of settlement included all the property to which Prewett had any title, except 3,680 acres of land which he had previously conveyed, by deed, to one Bates, his son-in-law, as will be hereafter more fully stated, and personal property of the value of $600 or $700. On November 20, 1865, Prewett had, by deed of that date, conveyed to his said son-in-law, James R. Bates, for the recited consideration of $25,982, 4,400 acres of land, which included the 3,680 acres of land just mentioned.

The consideration was made up of an account said to be due to Bates from Prewett, amounting to about $18,000, and the residue of the purchase price was to be paid to Prewett in money. The account was for eleven years' services as overseer, with interest computed from the close of each year, eight years' hire of a slave, with interest computed in the same manner, and the price of a horse, $250, and $220 interest thereon. There were no payments or credits on the account. Prewett testified that this deed, some time after its execution, and before the execution of the marriage settlement, was returned to him by Bates, and their contract in reference to said 4,400 acres of land rescinded. Bates, however, did not re-convey the land to Prewett, nor was the deed therefor canceled even, and Prewett must have considered the deed as of some effect, for in June, 1866, after the marriage settlement, he returned no property of his own for taxation, so that the marriage settlement included all the property of Prewett not covered by deeds of conveyance, except $600 or $700 worth of personal property. On July 16, 1866, Prewett, by deed of that date, conveyed to Bates 3,680 acres of land, parcel of the 4,400 acres mentioned in the deed of November 20, 1865, in satisfaction of the said debt due from Prewett to Bates, on the account before mentioned, the amount of which was stated by the parties at $18,560.80. These lands, it was agreed, were worth $2 per acre. On May 6, 1866, Richard and Josephine Prewett were married. On June 25th following, Prewett gave in for taxation, in the name of his wife, all the lands embraced in the marriage settlement, and returned no property whatever of his own for taxation. On July 16, 1866, the day when the last conveyance was made by Prewett to Bates, Josephine Prewett made her last will, whereby, in the event of her dying without issue by her then husband, she devised and bequeathed to one Hodges, all her estate, real and personal, in trust, to pay over to Richard Prewett, her husband, all the annual rents, issues and profits thereof, and in case of her dying leaving issue of her said marriage with Richard Prewett, she devised to the said Hodges a child's share of her estate, real and personal, in trust for the said Richard Prewett, upon the like terms and conditions as she had devised her entire estate, in case of her dying without issue living of her marriage with said Richard Prewett. Prewett testified that he was not informed of the contents of this will until 1870. On December 29, 1868, Richard Prewett filed his petition in bankruptcy, and the only property returned in his schedule was his wearing apparel, valued at $50. In her answer, filed December 17, 1866, to a bill in equity, brought against her and others, in the state chancery court, to set aside this marriage settlement made on her by Richard Prewett, Josephine Prewett said that "at the time of the execution of said deed (the marriage settlement), as well as at the time she contracted to marry the said Richard, she knew that he was embarrassed and indebted, but to what extent, and to whom, she did not know, and does not now know. * * * It was because of her knowledge of the embarrassed condition of the said Richard that she stipulated at the time of her engagement of marriage aforesaid, for the promises, covenants and undertakings of the said Richard, particularly set out and described in the deed of conveyance aforesaid." The answers of both Richard Prewett and Josephine Prewett, which are under oath, deny that there was any fraudulent purpose in the execution and delivery and acceptance of the deed of settlement, and aver the entire bona fides of the transaction.

S. D. Cabiniss and F. P. Ward, for complainant.

L. P. Walker, D. D. Shelby, Milton Humes, and Geo. S. Gordon, for defendants.

WOODS, Circuit Judge. The attack on the marriage settlement is made by the assignee in bankruptcy of Richard Prewett, representing his creditors, and the charge is, that the settlement was made by Richard Prewett, and accepted by Josephine Prewett, with the purpose to hinder, delay and defraud the creditors of the former, and is, therefore, null and void. The bill prays that the deed may be so declared, and the property described therein turned over to the assignee, and by him administered as assets of the bankrupt estate.

The principles of law which apply to a case like this are well settled. "Nothing can be clearer, both upon principle and authority, than the doctrine that to make an ante-nuptial settlement void as a fraud upon creditors, it is necessary that both parties should concur in, or have cognizance of, the intended fraud. If the settler alone intend a fraud, and the other party have no notice of it, but is innocent of it, she is not, and cannot be affected by it. Marriage, in contemplation of law, is not only a valuable consideration to support a settlement, but is a consideration of the highest value, and from motives of the soundest policy, is upheld with a steady resolution. The husband and wife, parties to such a contract, are, therefore, deemed, in the highest sense, purchasers for a valuable consideration, and so that if it is bona fide and without notice of fraud, brought home to both sides, it becomes unimpeachable by creditors. Fraud may be imputable to the parties, either by direct co-operation in the original design at the time of its concoction, or by constructive co-operation from notice of it, and by carrying the design, after such notice, into execution." Magniac v. Thompson, 7 Pet. [32 U. S.] 348. See, also, 1 Bish. Mar. Wom. § 775; Co. Litt. 9 (G); Schouler, Dom. Rel. 263; Ford v. Stuart, 15 Beav. 493; Nairn v. Prowse, 6 Ves. 752; Peachy, Mar. Settl. 56; Armfield v. Armfield, 1 Freem. Ch. [Miss.] 311; Sterry v. Arden, 1 Johns. Ch. 261; Verplank v. Sterry, 12 Johns. 536; Johnston v. Dilliard, 1 Bay, 232, 234; Huston v. Cantril, 11 Leigh, 136; Tunno v. Trezevant, 2 Desaus. Eq. 264; Whelan v. Whelan, 3 Cow. 537. In Cadogan v.

Kennett, 2 Cowp. 432, which was an action of trover brought by the plaintiff's trustees, under the marriage settlement of Lord Montford, against the defendant, who was a judgment creditor of Lord Montford, and the sheriff's officers, to recover certain goods taken by them in execution, Lord Mansfield said: "If the transaction be not bona fide, the circumstance of its being done for a valuable consideration will not alone take it out of the statute. I have known several cases where persons have given a full and fair price for goods, and where the possession was actually changed. Yet, being done for the purpose of defeating creditors, the transaction has been held fraudulent and void." * * "The question in every case is, whether the act done is a bona fide transaction, or whether it is a trick or contrivance to defeat creditors." "A man who is indebted may, on his marriage, make a settlement of his property, provided the settlement is made honestly and in good faith, and the wife's knowledge of his indebtedness will not alone render it void. It is however, clearly established that marriage cannot be made the means of committing fraud. If there is intent to delay, hinder or defraud creditors, and to make the celebration of a marriage part of a scheme to protect property against the rights of creditors, the consideration of marriage cannot support the settlement." Bump, Fraud. Conv. 308, citing Bulmer v. Hunter, L. R. 8 Eq. 46; Ex parte McBurnie, 1 De Gex, M. & G. 441; Betts v. Union Bank, 1 Har. & G. 175; Campion v. Cotton, 17 Ves. 264; Richardson v. Horton, 7 Beav. 112; Colombine v. Penhall, 1 Smale & G. 228. Notice of the fraud may be inferred from the facts and circumstances of the settlement. Colombine v. Penhall and Bulmer v. Hunter, supra. If the amount of property settled is extravagant, or grossly out of proportion to the station and circumstances of the husband, this, of itself, is sufficient notice of fraud. Ex parte McBurnie, supra; Croft v. Arthur, 3 Desaus. Eq. 223.

In an able opinion, in the case of Davidson v. Graves, reported in Riley, Eq. Cas. 232, Justice Nott, of South Carolina, says: "There is no case that I have seen, where a man has been permitted to make an intended wife a mere stock to graft his property upon, in order to place it beyond the reach of his creditors. A marriage settlement must be construed like every other instrument. The question may always be raised, whether it was made with good faith, or intended as an instrument of fraud. Even though marriage may be a part of the consideration, fraud may be mingled with it, and that may be as well inferred from internal evidence as from circumstances aliunde. Marriage is put on the footing of a pecuniary consideration. And it is said, if a person sell his property for a full consideration and squander the money, his creditors have no redress. From which it is inferred, that marriage will afford the same protection. But, in the case of a bona fide

sale, the seller has parted with his property, the purchaser has parted with his money, and the law will presume that the object was the payment of his debts. But the purchaser is not answerable for the misapplication of the money. It is not so with a marriage settlement. The seller does not, in fact, part with his property. It is still intended for his own enjoyment. Neither does he receive in return anything that will satisfy his creditors. His wife will not be received in payment of his debts. It is not to be understood that because marriage is equivalent to a pecuniary consideration, it is to be considered in the nature of an actual purchase. A settlement is not intended as the price of the wife, but as a provision for a family. It must, therefore, be reasonable, and with a due regard to the rights of others. A creditor has an equitable claim to the property of the debtor."

Applying these rules of law to the facts of this case, it is to be determined whether the purpose of Richard Prewett, in making the conveyance to the woman whom he proposed to marry, was to hinder, delay or defraud his creditors, and, if it were, whether Josephine Prewett had notice of such purpose before the marriage. As to the first question, the evidence leaves no doubt in my mind touching the fraudulent intent of Richard Prewett. To ascertain the intent of the settler we are authorized to consider fraudulent transfers to other persons at or about the time of the transfer assailed: Bump on Fraudulent Conveyances, 545, and numerous authorities there cited. The evidence shows that Prewett had been insolvent ever since the close of the late war; that he was largely insolvent on November 20, 1865, when he made a conveyance to his son-in-law, Bates, of 4,400 acres of land. The consideration named in this deed was $25,982 in money. Prewett testifies that this was not the real consideration, but that it was the discharge of his debt to Bates, and the payment by Bates of the residue in money. He further says, that at the date of this deed no formal account was stated between him and Bates, but the debt was supposed to be $17,000 or $18,000; but that afterwards, in July, 1866, the account was stated, which showed that there was due from Prewett to Bates the sum of $18,560.80. The account is in evidence, and it bears upon its face the earmarks of a trumped-up account. There is not a word of evidence to show that any contract had ever been made by Bates for his own services, or for the hire of his slave, or for the sale of his horse; that any note had ever been given, or any account kept. In fact, Prewett says the account was never stated till eight months after the date of the deed of November 20, 1865. It is a remarkable fact, too, that for a period of eleven years this account should be allowed to run, without a single credit or payment. That such an account could be bona fide seems incredible. And yet, upon such an account, at that time uncertain in amount, and without the payment of a cent

of money, and without taking from him any evidence of debt, Prewett conveys lands to Bates which he estimated to be worth $26,000. If this were the deed assailed, no court would have any hesitation in pronouncing it fraudulent. We find, then, that in November, 1865, Prewett, being hopelessly insolvent, is attempting to cover up a large part of his property by a fraudulent deed to his son-in-law. For some reason the device was abandoned, and the deed returned to Prewett, but there was no re-conveyance of the land to him, and in the following April Prewett executed the marriage settlement. He owed his creditors $90,000. His available means amounted to little over $50,000. Of these means he devoted $13,000 to the payment of two favored creditors, he retained lands worth about $7,000, which must have been under the cloud of the deed of November, 1865, which was never canceled, and which he afterwards conveyed to his son-in-law, Bates, in payment of the account heretofore referred to, and he conveyed to his intended wife all the residue of his property, worth, according to the agreed facts, $32,776, leaving about $70,000 of debts unprovided for.

The mere statement of these facts reveals the purpose of Prewett. He commenced his attempts to defeat his creditors, by a fraudulent deed, in November, and he closes by a deed by which he, in effect, secures to himself the enjoyment of more than three-fifths of his property, by a conveyance to his intended wife, and leaves creditors to the amount of $70,000 entirely unprovided for. The effect of this deed was to hinder, delay and defraud his creditors, who were not mentioned in the marriage settlement, for it conveyed all the property which he had not before conveyed, and left such creditors nothing. Prewett must be held to know what he was about, and to intend the natural consequences of his act. The pretense that he was insolvent in April, 1866, but did not know it, is absurd. He owed $90,000, which was bearing interest, and he had but $50,000 of property to pay it with. The disposition of $33,000 of this property, all that he had not covered by a former deed, in such a way as to place it beyond the reach of his creditors, while, at the same time, he received no pecuniary equivalent which he could apply to his debts, shows clearly his purpose to defraud his creditors. Prewett was, at the date of the settlement, embarrassed and largely insolvent. The property settled on his proposed wife was out of all reasonable proportion to his means, even if he had owed no debts. The property settled was equitably the property of his creditors. The deed of settlement conveyed, substantially, all his property not covered by a previous conveyance which was still in force, and it left creditors to the amount of $70,000 entirely unprovided for. When, in December, 1868, Prewett filed his schedule in bankruptcy, he reported his wearing apparel, valued at $50,

as his only assets. We find, then, that the fraud upon the creditors, designed and consummated by Prewett, was gross and palpable. But fraud brought home to the settler is not of itself sufficient to avoid the settlement. The grantee must participate in the fraud, or at least have cognizance of it. It is, therefore, to be inquired, whether Josephine Prewett had, before her marriage with Richard Prewett, notice of the fraud which Prewett contemplated, and which he carried into execution by means of the marriage settlement. We know, from her own answer, that before the execution of the marriage settlement she was advised that Prewett was indebted, and that he was embarrassed, and it was, as she says, on account of his indebtedness and embarrassment that she demanded a marriage settlement before she would consent to marry him. Why did she make this demand? Clearly because she feared that the creditors of Prewett might sweep away his property and leave her destitute. With this knowledge Prewett presents to her a conveyance, which transfers to her property worth $32,776. Could she, bona fide, knowing that Prewett was indebted and embarrassed, accept a conveyance for so large a sum? Could she shut her eyes and say she did not know the extent of his debts, did not know of his fraudulent purpose, and, therefore, she received the deed in good faith?

Actual knowledge of the fraudulent intent is not necessary. A knowledge of facts sufficient to excite the suspicions of a prudent man or woman, and to put him or her on inquiry, amounts to notice, and is equivalent to actual knowledge in contemplation of law. Atwood v. Impson, 5 C. E. Green [20 N. J. Eq.] 150; Tantum v. Green, 6 C. E. Green [21 N. J. Eq.] 364; Jackson v. Mather, 7 Cow. 301; Smith v. Henry, 2 Bailey, 118; Mills v. Howeth, 19 Tex. 257. It has even been held that the means of knowledge, by the use of ordinary diligence, amounts to notice. Farmers' Bank v. Douglass, 11 Smedes & M. 469. But in this case it is not necessary to go so far. The indebtedness and pecuniary embarrassment of Prewett, and the large estate conveyed by the deed of settlement, put Josephine Prewett on inquiry, and she is chargeable with knowledge of every fact which she could have learned on inquiry. She might have learned all that the evidence in this case discloses about the amount of Prewett's debts and property, and such knowledge would have made clear Prewett's fraudulent purpose. She is, therefore, chargeable with notice of the fraud, and her acceptance of the deed of settlement, after such notice, makes her a party to the fraud, and renders the marriage settlement null and void. The creditors of Prewett, whose bona fide debts were provided for by the marriage settlement, can take no benefit from the fraudulent instrument. When a deed in favor of two persons is obtained by the fraud of one, although without the privity of the other, the deed will

be void as to both. Whelan v. Whelan, 3 Cow. 537; Hunt v. Bass, 2 Dev. Eq. 292; Huguenin v. Baseley, 14 Ves. 273; Townsend v. Harwell, 18 Ala. 301. Although they had no notice or knowledge of the fraud contemplated by Prewett, yet the fact that the grantee, under whom their rights are claimed, not only had notice of the fraud, but was a beneficiary under the fraudulent deed, avoids the instrument as to the beneficiary as well as to the grantee.

The result of these views is, that the marriage settlement made by Richard upon Josephine Prewett, must be declared void for all purposes, and the property conveyed thereby turned over to the assignee in bankruptcy for administration.

[On appeal to the supreme court, the decree of this court was reversed, and the cause remanded, with directions to dismiss the bill. 103 U. S. 22.]